[Civ. No. 23047. Fourth Dist., Div. Two. May 5, 1981.]

SANTIAGO COUNTY WATER DISTRICT, Plaintiff
and Appellant, v.
COUNTY OF ORANGE et al., Defendants and Respondents;
HON DEVELOPMENT COMPANY et al., Real Parties in Interest
and Respondents.

**COUNSEL**

Pizer & Michaelson and Barry S. Michaelson for Plaintiff and Appellant.

Adrian Kuyper, County Counsel, and John R. Griset, Deputy County Counsel, for Defendants and Respondents.

Gibson, Dunn & Crutcher and Peter J. Thurston for Real Parties in Interest and Respondents.

OPINION

**MORRIS, J.**—Santiago County Water District (Water District) is challenging the sufficiency of an environmental impact report (EIR) that was approved by the Orange County Board of Supervisors. The purpose of the EIR was to examine the consequences of permitting the real parties in interest (Mining Company) to operate a sand and gravel mining operation within the Water District's jurisdiction. The Water District filed suit to compel the county to set aside its approval of the EIR. When the trial court denied the petition for a writ of mandate, the Water District appealed. We reverse.

*Standard of Review*

In 1970, the Legislature enacted the California Environmental Quality Act (CEQA). An express purpose of CEQA is that state agencies give "major consideration" to preventing damage to the environment when conducting their regulatory functions. (Pub. Resources Code, § 21000, subd. (g).)[1] To accomplish this, an environmental impact report is required to be written prior to a project's approval. (§§ 21100, 21151.) The EIR identifies significant effects of a project on the environment, the way those effects can be mitigated or avoided, and the alternatives to the project. (§ 21002.1, subd. (a).) It is "an informational document which . . . will inform public decision-makers and the general public of the environmental effects of projects they propose to carry out or approve." (Cal. Admin. Code, tit. 14, § 15012.)[2] The EIR has been referred to as "the heart of CEQA" and as "an environmental 'alarm bell' whose purpose it is to alert the public and its responsible officials to environmental changes before they have reached ecological points of no return." (*County of Inyo* v. *Yorty* (1973) 32 Cal.App.3d 795, 810 [108 Cal.Rptr. 377].)

---

[1]All references are to the Public Resources Code unless otherwise stated.

[2]All further references to the California Administrative Code will be cited as Guidelines.

■ In reviewing the adequacy of the county's actions in preparing the EIR for the sand and gravel mining plant, we are limited to deciding "whether there was a prejudicial abuse of discretion ... [which] is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." (§ 21168.5.) Thus, we do "not pass upon the correctness of the EIR's environmental conclusions, but only upon its sufficiency as an informative document." (*County of Inyo* v. *City of Los Angeles* (1977) 71 Cal.App.3d 185, 189 [139 Cal.Rptr. 396].) However, we must be satisfied that the county has fully complied with the procedural requirements of CEQA, because only in this way "can a subversion of the important public purposes of CEQA be avoided." (*People* v. *County of Kern* (1974) 39 Cal.App.3d 830, 842 [115 Cal.Rptr. 67].)

### Preparation of the EIR

On April 19, 1978, the Water District received a letter from a firm which had been hired by the Mining Company to prepare the EIR for the proposed sand and gravel operation in Williams Canyon. The firm's letter stated that the county's environmental management agency (EMA) wanted a "will serve" letter from the Water District included in the draft EIR. By employing recycling, the firm informed the Water District, the sand and gravel plant's water use would be approximately "1000 gallons per hour of water." The Water District responded on April 25 by sending a form "can serve" verification which indicated that an adequate supply of *domestic* water could be furnished. In an accompanying letter, the Water District's general manager described the existing water facilities relevant to the proposed project (e.g., the location of an eight-inch filtered and treated water main, the size of the Water District's water pumps, and the location and storage capacity of a reservoir). The general manager's letter also stated, "As you are probably aware, there has been no engineering regarding water service to the proposed development. Current District policy provides that the cost of improvements, extension of water lines, additional reservoir and pumping capacity, will be borne by the developer. The District will be happy to assist you in obtaining the required facilities, but is not in a position to provide direct financial assistance."

On April 24, the EMA sent out notices, pursuant to section 21080.4,[3] of the intent to prepare a draft EIR. One notice was addressed to "San-

---

[3]At the time that the notices were sent, section 21080.4, subdivision (a) stated in part, "In the event that a lead agency determines that an environmental impact report

tiago Canyon [*sic*] Water District (Responsible Agency)." The notice identified Orange County as the lead agency for the project and correctly summarized the Water District's duties under state law: "In order for the concerns of your agency to be incorporated into the Draft EIR, we need to know the views of your agency as to the scope and content of the environmental information relevant to your agency's statutory responsibilities in connection with the proposed project. Your agency must consider the EIR prepared by the County of Orange when considering your permit or approval for the project." (See § 21080.4, subd. (a), Guidelines, § 15066, subd. (d).) The notice also stated that the Water District's response had to be sent within 45 days, "[p]ursuant to Section 15085.5 of the State EIR guidelines." Guidelines section 15085.5 sets out the "Process for a Responsible Agency" and includes, in subdivision (b)(2), a 45-day deadline for replying to a notice of preparation. (See also § 21080.4, subd. (a), Guidelines, § 15054.3.) Aside from the Water District's above-mentioned response to the request for a "will serve" letter, the record reflects no communication between the Water District and the county during the 45 days after the receipt of the notice of preparation.

A draft EIR was distributed to the Water District on August 21. A cover letter from EMA stated, "regulations require that in the preparation of environmental documentation for a project, the 'Lead Agency' shall consult with all public agencies having jurisdiction over such projects and encourage consultation with others who may have special expertise relating to the project." (See § 21153, Guidelines, § 15085, subd. (d)(1).) The letter went on to request "comment concerning both the project and the adequacy of this Draft EIR as it relates to your area of jurisdiction or expertise."[4] It was asked that such comments be returned to EMA by September 20.

is required for a project, such lead agency shall immediately send notice of such determination by certified mail to each responsible agency." (Stats. 1977, ch. 1200, § 6, p. 3998; see also Guidelines, §§ 15066, subd. (c), 15085, subd. (b)(1).)

A lead agency is "the public agency which has the principal responsibility for carrying out or approving a project which may have a significant effect upon the environment." (§ 21067.) A responsible agency is "a public agency which proposes to carry out or approve a project, for which a Lead Agency has prepared the environmental documents. . . . [T]he term 'responsible agency' includes all public agencies other than the lead agency which have discretionary approval power over the project." (Guidelines, § 15039.)

[4]Guidelines section 15085.5, subdivision (d) states, "A Responsible Agency should review and comment on draft EIRs . . . for projects which the Responsible Agency

On September 20, the Water District sent its comments on the draft EIR to EMA. In January 1979, the county published its responses to the comments of various agencies and groups on the draft EIR, which comments and responses were included in the final EIR as required by Guidelines section 15146. The relevant comments of the Water District and the county's responses thereto are as follows:

"(1) In our letter dated April 25, 1978 [the response to the request for a 'will serve' letter], District pointed out that there has been no engineering regarding water service to the proposed project, only that a domestic supply exists along Santiago Canyon Road. At the present time, [the Water District] has no facilities in Williams Canyon. It is possible, depending upon the additional demands this project will place on our existing system, that additional pumping and storage will need to be installed as well as the possibility of replacing the existing water main from Silverado and Santiago (Fleming Pump Station) to the project site."

Response, after quoting from the Water District's earlier letter: "The developer will furnish the District with detailed plans of works which will enable the District to project possible additional demands on the existing system, and which will allow the District to adequately project water supply for the proposed project (pers. comm., G. Buck, Vice President, [Mining Company], 10/13/78). [¶] It should be noted that in the Jackson Ranch EIR 096 and the subsequent Land Use Element Amendment 78-2, dated August 18, 1978: [¶] *Water-Existing Conditions*: 'The project area is served by the Santiago County Water District. The District obtains its water supply from the Santiago Aqueduct and a well at the eastern end of Silverado Canyon. The Santiago County Water District has indicated that they will serve the proposed project.'"

"(2) In order to develop an engineering plan of works for water supply, including fire protection, to the project site, more detail is needed with respect to maximum operating hours and maximum tons per hour of product. It is District's belief that the estimated water requirements

would later be asked to approve. Comments should focus on any shortcomings in the EIR . . . or on additional alternatives or mitigation measures which the EIR should include. The comments may deal with any aspect of the project or its environmental effects. Comments should be as specific as possible."

of two gallons of water per ton of processed product[5] is extremely low. Observations of the Transit Mixed operation, particularly the transportation of wet sand, is that they use *considerably* more than two gallons of water per ton of product."

Response: "The water consumption estimated for the proposed 500-ton-per-hour sand and gravel operation in Williams Canyon is expected to be 5 gal/min per ton/hr. Based upon this ratio, the water usage will be approximately 2,500 gallons per minute per 500 ton per hour (pers. comm., Smith, OWL Rock Company, 1979). The water recycleable rate based on data from Don Fife, sand and gravel analyst, can be 50% to 70% of the water used. [¶] The estimated water requirement for the Batch Plant operation is 38 gallons per yard. This figure will vary depending upon the ratio of cement to water and the purpose of the mix (pers. comm., Bob Vanrooy, Livingston-Graham)."

"(3) The Transit Mixed Sand and Gravel Plant, which is located at the entrance to Blackstar Canyon, is served by this district. District has installed four (4) two-inch (2″) meters capable of 160 gallons per minute each for a total interruptable supply from District of 640 gallons per minute. Occasionally, they make use of the total supply available."

Response: "No response."

"(4) The District has not indicated present capability to supply water to the project.[6] [The Water District] has only acknowledged that the project is within our service area. District has indicated the facilities that currently exist and have [*sic*] stated that the cost for installation of any improvements, additional storage, pumping or pipelines will be borne by the developer."

Response, after quoting from the Water District's earlier letter: "The developer will furnish the District with detailed sewer and water plans for the proposed operation, which will enable the district to project pos-

---

[5]As in the original letter requesting a "will serve" letter, the draft EIR estimated that the mining operation would produce 500 tons per hour and would require two gallons of water for each ton, thus using 1,000 gallons of water per hour. The draft EIR concluded that "[o]verall consumption will depend on production rate and hours of operation."

[6]The draft EIR stated, "The District has indicated their ability to supply the water," referring to an appendix which contained a copy of the Water District's April 25 response to the request for the "will serve" letter.

sible additional demands on the existing system and will allow the District to adequately project water supply for the proposed project. The project proponent intends to share the appropriate costs with the District (pers. comm., G. Buck, Vice President, [Mining Company], 10/13/78)."

The county's responses apparently did not satisfy the Water District. The district's reservations about the project were expressed to a Mining Company representative when he requested a "can serve" letter at the Water District's February 2 board of directors meeting and to the EMA in a February 23 letter from the Water District's engineer, Donald Seitz. The letter stated that the Water District "remains concerned regarding the potential demand of this project on its limited water supply." Seitz went on to explain: "The District's supply and the delivery capabilities are 4 cubic feet per second (cfs). By way of comparison, the Transit Mixed Sand and Gravel operation is served by the District through four 2″ meters which have a maximum capacity of 1.4 cfs, plus they have a well that will produce 1.3 cfs for a total of 2.7 cfs. The EIR on the proposed development states that the subject development may be a larger operation by several times and may have a concrete batch plant in addition. Also, there does not appear to be the possibility of a well supply to help provide the Williams Canyon project's needed water demands."

The county board of supervisors held a public hearing on the final EIR on May 2. The EIR contained the following items relating to the provision of water to the project:

1) The Water District's comments on the draft EIR and the responses thereto;

2) The February 23 letter of Donald Seitz;

3) In the "Description of Existing Environmental Setting" section (see Guidelines, § 15142), there is an extended quotation from a different EIR describing the history, operations, facilities, costs, and domestic service capacity of the Water District. The quotation is supplemented by this information: "Santiago District is supplied by the Metropolitan Water District under an agreement for four cfs. The District is unable to fully utilize this source since they are limited by a 1.5 cfs (969,400 gpd) treatment capacity under an agreement with the East Orange

Water District. Present utilization averages between 0.75 and 1.0 cfs (784,700-606,880 gpd). The largest consumer in the District is the Azusa Western Incorporated sand and gravel plant."

4) Later in the same "Description of Existing Environmental Setting" section, it is noted that "[t]he Santiago County Water District, at Silverado Canyon Road and Black Star Canyon Road, Silverado; provides water via a two-inch pipe to the Williams Canyon area connecting to an eight-inch line in Santiago Canyon."

5) In the "Environmental Impacts" section (see § 21100, subd. (a), Guidelines, § 15143(a)), the EIR states, "Process water will be purchased from the Santiago County Water District. Processing will require an estimated two gallons of water per ton of processed product. At a processing rate of 500 tons per hour, water use will be approximately 35,000 gallons per day. However all but 1,000 gallons per hour of this will consist of water recycled through the settling ponds, so that total water consumption will be approximately 12,000 to 15,000 gallons per day, depending on production rate and hours of operation. The District has indicated their ability to supply the water (Seitz 1978)."

6) The "Mitigation Measures" section (see § 21100, subd. (c), Guidelines, § 15143(c)) discusses water mostly in the context of erosion and siltation control, but does contain the information that "[p]rocess water which leaves the plant will be stored in desiltation ponds and recycled through the plant."

7) Listed as one of the "Unavoidable Adverse Impacts" (see § 21100, subd. (b), Guidelines, § 15143(b)) is the "[i]ncreased demand upon water available from the Santiago County Water District."

Following the public hearing, the board of supervisors found that the EIR was complete and adequate. Based upon this finding, the board then approved SG Site Permit No. SG 78-1. The approval, however, was subject to 21 conditions. Number 17 reads, "Prior to commencement of mining operations or the issuance of a sand and gravel extraction permit, the operator shall establish an adequate water supply and appurtenant system to supply the water needs of the mining operation, processing plant and reclamation irrigation."

### *Adequacy of the EIR*

As was stated earlier, this court will not review the validity of an EIR's conclusions, but only the sufficiency of the EIR as an informative document. ■ However, the ultimate decision of whether to approve a project, be that decision right or wrong, is a nullity if based upon an EIR that does not provide the decision-makers, and the public, with the information about the project that is required by CEQA. ■ Our review of the final EIR in this case leads us to conclude that it does not meet the standards of an adequate EIR, because of its failure to give sufficient information concerning the delivery of water to the proposed sand and gravel mine.

Information about the water supply to the project is lacking in two significant areas. Nowhere in the EIR is there a description of the facilities that will have to be constructed to deliver water to the mining operation, or facts from which to evaluate the pros and cons of supplying the amount of water that the mine will need.

Unarguably, the currently existing water delivery equipment cannot adequately supply the water needs of a sand and gravel mine in Williams Canyon. Additional facilities will have to be built. The EIR, however, ignores this aspect of the project. In the comment-response section of the EIR, the Water District pointed out that it has no facilities in Williams Canyon, that there is only a domestic supply along Santiago Canyon Road, and that it is possible "that additional pumping and storage will need to be installed as well as the possibility of replacing the existing water main from Silverado and Santiago (Fleming Pump Station) to the project site." The response, instead of specifying the equipment that will be needed, merely states that "[t]he developer will furnish the District with detailed plans of works." This is not nearly enough.

The construction of additional water delivery facilities is undoubtedly one of the significant environmental effects of the project.[7] As such, a description of the necessary construction had to be included if the EIR was to serve its informational purpose. (§ 21100, subd. (a), Guidelines,

---

[7] A significant effect on the environment is defined to be "a substantial, or potentially substantial, adverse change in any of the physical conditions within the area affected by the activity including land, air, water, minerals, flora, fauna, ambient noise, and objects of historic or aesthetic significance." (Guidelines, § 15040.)

§ 15143, subd. (a).) Because of this omission, some important ramifications of the proposed project remained hidden from view at the time the project was being discussed and approved. This frustrates one of the core goals of CEQA. "Only through an accurate view of the project may affected outsiders and public decision-makers balance the proposal's benefit against its environmental cost, consider mitigation measures, assess the advantage of terminating the proposal ... and weigh other alternatives in the balance. An accurate, stable and finite project description is the *sine qua non* of an informative and legally sufficient EIR." (*County of Inyo* v. *City of Los Angeles, supra,* 71 Cal. App.3d 185, 192-193.)[8]

The same problem arises with regard to the quantity of water needed by the mining operation. The EIR discloses that a large amount of water, 12,000 to 15,000 gallons per day, will be consumed by the mine. It also states the capacity and average present utilization of the Water District. But, when it comes to the critical issue of the environmental impact of supplying such a large amount of water to the project, the EIR says that "[t]he District has indicated their ability to supply the water (Seitz 1978)." Two observations may be made about this conclusion. First, it is not true. It is not clear what "Seitz 1978" refers to, but the only communication from Donald Seitz, the Water District's engineer, that appears in the EIR is the February 23, 1979 letter that expresses the Water District's continuing concern "regarding the potential demand of this project on its limited water supply."[9] Five months earlier, in commenting on the draft EIR, the Water District specifically pointed out that it "has not indicated present capability to supply water to the project." Additionally, on April 18, 1979, only two weeks before the board of supervisors approved the EIR, the Water District's presi-

---

[8]Similar sentiments have been expressed in the federal courts interpreting the National Environmental Policy Act (NEPA), a law substantially similar to CEQA. (See *Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247, 260-261 [104 Cal.Rptr. 761, 502 P.2d 1049].) An environmental impact statement (EIS), the federal equivalent of an EIR (see Guidelines, § 15028), "serves as an environmental full disclosure law, providing information which Congress thought the public should have concerning the particular environmental costs involved in a project." (*Silva* v. *Lynn* (1st Cir. 1973) 482 F.2d 1282, 1285.) "The detail required [in an EIS] is that which is sufficient to enable those who did not have a part in its compilation to understand and consider meaningfully the factors involved." (*Environmental Def. F., Inc.* v. *Corps of Eng. of U.S. Army* (5th Cir. 1974) 492 F.2d 1123, 1136.)

[9]Seitz also stated in that letter that "the District is concerned that the subject development may be anticipating utilizing a water supply which may exceed the District's master planned capacity to meet that demand."

dent wrote to the board that "the District is not in a position to determine if, and under what conditions, it is capable of providing water service to the proposed development. Your Honorable Board should not, therefore, at this time rely on any statement that [the Water District] is able or has committed to provide water to the proposed development."

Second, the conclusion, even if it were true, is insufficient to allow the EIR to fullfil its informational purpose. The EIR must contain facts and analysis, not just the bare conclusions of a public agency. An agency's opinion concerning matters within its expertise is of obvious value, but the public and decision-makers, for whom the EIR is prepared, should also have before them the basis for that opinion so as to enable them to make an independent, reasoned judgment.

Moreover, even if the Water District does have the ability to meet the water requirements of the project, the EIR is silent about the effect of that delivery on water service elsewhere in the Water District's jurisdiction. The conclusion that one of the unavoidable adverse impacts of the project will be the "[i]ncreased demand upon water available from the Santiago County Water District" is only stating the obvious. What is needed is some information about how adverse the adverse impact will be. "An EIR should be prepared with a sufficient degree of analysis to provide decision makers with information which enables them to make a decision which intelligently takes account of environmental consequences." (Guidelines, § 15150.)

The county has attempted to remedy the inadequacies of the EIR by presenting evidence to the trial court to show that there are sufficient water resources available for the project. Indeed, the trial court made findings of fact to such effect. This, however, is beside the point. It is the adequacy of the EIR with which we are concerned, not the propriety of the board of supervisors' decision to approve the project. "[W]hatever is required to be considered in an EIR must be in that formal report; what any official might have known from other writings or oral presentations cannot supply what is lacking in the report." (*Environmental Defense Fund, Inc.* v. *Coastside County Water Dist.* (1972) 27 Cal.App.3d 695, 706 [104 Cal.Rptr. 197].)

*Standing to Sue*

█ The parties spend considerable time arguing whether or not the Water District is a "responsible agency" under CEQA. The debate was

prompted by the assertion of the Mining Company and the county that an agency which is not a responsible agency lacks standing to challenge an EIR. We find it unnecessary to mediate this argument since we conclude that being a responsible agency is not a prerequisite for challenging an EIR's adequacy.[10]

Neither CEQA nor any cases provide any specific standard for determining what characteristics a party needs in order to have standing to challenge an EIR.[11] We therefore apply the general rules of standing for writ of mandate actions.

A writ of mandate may only be issued to a "party beneficially interested." (Code Civ. Proc., § 1086.) This requirement has been interpreted to mean that the petitioner must have "some special interest to be served or some particular right to be preserved or protected over and above the interest held in common with the public at large." (*Carsten* v. *Psychology Examining Com.* (1980) 27 Cal.3d 793, 796 [166 Cal.Rptr. 844, 614 P.2d 276].) We conclude that the Water District clearly fits within this definition. The Water District is the agency directly responsible for providing water to the proposed project and thus has a special interest in insuring that the EIR fully and adequately deals with the delivery of water to the project.

The Supreme Court has held that the Board of Social Welfare was a beneficially interested party and could seek a writ of mandate to compel a county to issue duplicate warrants to three needy aged persons after their original warrants were cancelled for not being presented for payment within six months of issuance. (*Bd. of Soc. Welfare* v. *County of L.A.* (1945) 27 Cal.2d 98, 100-101 [162 P.2d 627].) The court noted

---

[10]We do note, however, the paradoxical position of the respondents, and especially the county, in claiming that the Water District is not a responsible agency, since the Water District was dealt with as a responsible agency throughout the EIR preparation process. For example, when the county EMA sent out notices of the intent to prepare a draft EIR, one was addressed to "Santiago Canyon [*sic*] Water District (*Responsible Agency*)." (Italics added.) In setting a 45-day deadline for reply to the notice, the EMA notice cited Guidelines section 15085.5, which section is entitled, "Process for a Responsible Agency." Additionally, the Mining Company states that such notice was sent pursuant to section 21080.4, subd. (a) (the lead agency "shall immediately send notice ... to each responsible agency") and Guidelines section 15066, subd. (c) ("the Lead Agency shall send to each Responsible Agency a Notice of Preparation.").

[11]A responsible agency apparently does have standing to challenge an EIR if the agency believes that the EIR is not adequate for use by that agency. (Guidelines, § 15085.5, subd. (e).)

the board's statutory power to supervise the administration of public assistance plans and the common financial and physical inability of persons receiving aid to maintain such lawsuits for themselves. The Water District here is in a position similar to the board in that case. A county water district has the power to "do any act necessary to furnish sufficient water in the district for any present or future beneficial use." (Wat. Code, § 31020.) Moreover, the Water District is in a much better position than its customers to evaluate the adequacy of an EIR as it applies to the environmental effects of providing water to a proposed project.

The Mining Company claims that the Water District has no discretion to decide whether to provide water service to the proposed project. Thus, the Mining Company contends, since a public agency's ministerial acts are outside the scope of CEQA (see § 21080, subd. (b)(1), *Plan for Arcadia, Inc.* v. *City Council of Arcadia* (1974) 42 Cal.App.3d 712, 724 [117 Cal.Rptr. 96]), the Water District does not have standing. We disagree. ■ Whether the performance of an action by a public agency be ministerial or discretionary is not determinative of the agency's status as a party beneficially interested. In *Brown* v. *Superior Court* (1971) 5 Cal.3d 509, 514 [96 Cal.Rptr. 584, 487 P.2d 1224], the Supreme Court ruled that California's Secretary of State had standing to seek a writ of mandate to compel a trial court to vacate its order sustaining a demurrer. The demurrer had been sustained on the ground that certain provisions of the Election Code were unconstitutional. The Secretary of State was held to be beneficially interested because "he bears overall responsibility for administering the disclosure laws the constitutionality of which is now challenged."

### Laches

■ The Mining Company contends, and the trial court ruled, that the Water District was guilty of laches in failing to timely comment on the draft EIR. The ruling of the trial court was erroneous.

The Mining Company claim of laches is based on the assertion that the Water District's letter of September 20, the deadline date for commenting on the draft EIR, was inadequate because it was not sufficiently specific in its criticisms. This is irrelevant to the laches issue. Laches operates as an equitable defense in certain situations when

a party has delayed in *filing an action.* Here there is no claim that the Water District engaged in such a delay.[12] When, as here, the action has been brought within the statute of limitations, there can be no laches for a delay "unless there are some facts or circumstances attending the delay which have operated to the injury of the defendants." (*Meigs* v. *Pinkham* (1910) 159 Cal. 104, 111 [112 P. 883].) In the present case, neither the county nor the Mining Company have stated facts that evidence any injury to them caused by a delay in the commencing of this action.

Even if some injury could be shown, it would be inadequate in scope to support a laches defense under CEQA. Such a defense "is in effect an assertion that the People's interest in the preservation of their environment and their interest in having all state agencies proceed in accordance with law must ... be subordinated to the People's interest in economical government." (*People* ex rel. *Dept. Pub. Wks.* v. *Bosio* (1975) 47 Cal.App.3d 495, 525-526 [121 Cal.Rptr. 375].) In environmental lawsuits, the defense of laches has rarely proved successful because of the strong public policy considerations to be served by reaching the merits of the case. (See *id.,* at pp. 525-529.)

### Estoppel and Waiver

■ Mining Company claims that the same facts supporting its laches defense also establish the defenses of estoppel and waiver against the Water District. The trial court agreed. We do not.

The record indicates that the Water District, while not the epitome of cooperativeness, consistently expressed its dissatisfaction with the environmental documents prepared by the county. That the Water District may not have communicated with the county with the required specificity is not grounds for preventing the challenge of the EIR. The upholding of an estoppel or waiver defense harms more than just the recalcitrant public agency bringing suit; it also contravenes the strong public policy of protecting the environment.

---

[12]Section 21167, subdivision (c) requires that any action "alleging that an environmental impact report does not comply" with CEQA must be commenced within 30 days after the lead agency has filed a notice of its approval of a project.

The judgment of the trial court denying the Water District's petition for a writ of mandate is reversed.

Kaufman, Acting P. J., and Garst, J.,* concurred.

A petition for a rehearing was denied May 19, 1981, and the petition of real parties in interest and respondents for a hearing by the Supreme Court was denied July 1, 1981.

---

*Assigned by the Chairperson of the Judicial Council.