Opinion
 

 MIHARA, J.
 

 Monterey Peninsula Water Management District (District) appeals from a judgment granting a peremptory writ of mandate ordering the District to set aside its certification of a final environmental impact report (EIR) and approval of the New Los Padres Dam and Reservoir project. The District also challenges the award of attorney’s fees pursuant to Code of Civil Procedure section 1021.5. California-American Water Company (Cal-Am)
 
 [1]
 
 has filed an amicus curiae brief in support of District’s appeal. For the reasons stated below we affirm the judgment.
 

 Factual and Procedural Background
 

 In response to a period of severe drought, the District was formed in 1978 for the purpose of conserving and augmenting the water supply and to protect the environmental quality of the Monterey Peninsula. The District boundaries encompass a 170-square mile area consisting of the cities of Carmel-by-the-Sea, Del Rey Oaks, Monterey, Pacific Grove, Sand City, Seaside, and portions of Marina, Fort Ord, and Monterey County.
 

 Following its formation, the District explored a variety of long-term water supply alternatives. Pursuant to the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.),
 
 [2]
 
 in 1982, the District issued a notice of preparation of an EIR for a 29,000-acre-foot New San Clemente Dam and Reservoir on the Carmel River. After completion of a
 
 *1114
 
 draft EIR/EIS
 
 [3]
 
 and public review of the New San Clemente Dam project, it was determined that a New Los Padres Dam and Reservoir project would be a less environmentally damaging feasible alternative.
 

 In January 1988, the District decided to prepare a supplemental draft EIR/EIS for the 24,000-acre-foot New Los Padres Dam and Reservoir. In August 1991, the supplemental draft EIR/EIS was published. The public comment period for oral and written comments on the New Los Padres supplemental draft EIR/EIS was from August through October 1991, during which time the District accepted written comments, conducted public workshops and held two public hearings.
 

 In written comments on the 1991 supplemental draft EIR/EIS, state and federal resource agencies requested that the District explore additional alternatives. In response, the District decided to prepare a second supplemental draft EIR/EIS.
 

 The second supplemental draft EIR/EIS analyzed five alternatives, including a New Los Padres Dam and Reservoir and a New Los Padres Dam and Reservoir combined with a desalination plant. The report identified New Los Padres Dam and Reservoir combined with the desalination plant as the District’s preferred alternative, provided the desalination project received voter approval.
 
 [4]
 

 The second supplemental draft EIR/EIS was released for public review in February 1993. The public comment period, during which time written comments were received, workshops conducted and public hearings held, lasted through the month of April 1993.
 

 Following the comment period for the second supplemental draft EIR/EIS, the District prepared the final EIR, which evaluated the New Los Padres Dam and Reservoir project as the environmentally preferable alternative.
 

 In December 1993, the United States Army Corps of Engineers published a public notice requesting comment on the District’s Clean Water Act section 404 permit application. Comments were received from December 3, 1993, through May 16, 1994.
 

 
 *1115
 
 The District published the final EIR/EIS in March of 1994. Four public workshops and a public hearing to receive oral and written comments on the final EIR/EIS took place on April 20, 25, and 28, 1994, respectively. May 2, 1994, was the final date for submitting written comments on the final report.
 

 One of the individuals who submitted written comments was Charity Crane. Among other concerns, Crane criticized the report’s description of the Cachagua Valley as “sparsely populated” with “no industry other than several vineyards.” Crane stated that the “Cachagua and the Tassajara areas have numerous vineyards and small world class, highly regarded wineries]. This industry is thriving and the area has achieved recognition world wide for its quality wines.” Crane then complained “air pollution from dust. . . affect[s] the production and maturation of wine grapes and will result in significant damage to this industry in the area. The loss of two year[’]s grape harvest or an inferior harvest will be a significant negative economic effect on the area which has not been addressed in the EIR.” The Esselen Tribe of Monterey also submitted comments on the EIR, and both Crane and the Esselen Tribe representative appeared at the public hearing held April 28, 1994.
 

 In an undated letter to the United States Army Corps of Engineers, the production manager of Bemardus Winery expressed his concern about potential local impacts of the new dam project. These included the creation of dust which would obstmct sunlight and coat vine leaves, the potential change of frost patterns due to the creation of a new body of water in Cachagua, and increased traffic that dam construction would create. The letter was received by the District on May 26, 1994.
 

 Jack Galante, general manager of Galante Vineyards and a professional environmental planner, wrote to the District on August 3, 1994. The eight-page letter detailed the concerns he and other viticulturists in Cachagua had with the final EIR/EIS and its lack of discussion on the project’s impact to local agriculture. In response, the District stated that the comment period for the final EIR/EIS had ended on May 2, 1994, and, accordingly, the District would not respond to Galante’s (or Bemardus Winery’s) concerns as part of the formal environmental process.
 
 [5]
 

 On September 19, 1994, the District’s board of directors conducted a public hearing at which various members of the public voiced their opposition to the New Padres Dam and Reservoir project. Included among the
 
 *1116
 
 speakers were three members of petitioner Citizens for Alternative Water Solutions (CAWS) who claimed the final EIR was inadequate in that it failed to study the project’s effect on viticulture or agriculture and chapter 14 of the EIR was not prepared by a person knowledgeable in Native American cultural resources. Nevertheless, the board passed Resolution No. 94-12, which adopted findings to certify that the March 1994 New Los Padres final EIR complied with CEQA. The board also voted to receive an addendum to the final EIR and to accept it as part of the final EIR/EIS.
 

 On October 18, 1994, Galante Vineyards, Rancho Galante, Bemardus and Dumey Vineyards filed a petition for writ of mandate directing the District to set aside its certification of the EIR and its ratification of the New Los Padres Dam and Reservoir as the preferred water supply project for the District. A first amended petition, adding CAWS and the Esselen Tribe of Monterey County as petitioners, was filed on January 30, 1995.
 

 On May 15, 1995, the District’s board received a second addendum to the final EIR. The second addendum was released for public review and a “voluntary” comment period on May 16, 1995. The second addendum was certified in August 1995. Due to the date it was certified, the parties agreed that the adequacy of the second addendum for the purpose of approving the certification of the final EIR was not before the court. Nevertheless, the court judicially noticed the addendum.
 

 After filing an extensive intended decision, the trial court issued a peremptory writ of mandate ordering District to set aside and void its certification of the final EIR and approval of the New Los Padres Dam and Reservoir project, and to prepare a focused supplemental EIR on viticultural issues prior to further consideration of permit approval. This appeal followed.
 

 Discussion
 

 I
 

 Standard of Review for CEQA Issues
 

 Judicial review of legal challenges brought under CEQA is governed by statute. Section 21168.5, applicable to quasi-legislative administrative decisions as in this case, “provides that a court’s inquiry in an action to set aside an agency’s decision under CEQA ‘shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.’ As a result of this
 
 *1117
 
 standard, ‘[t]he court does not pass upon the correctness of the EIR’s environmental conclusions, but only upon its sufficiency as an informative document.’ . . .”
 
 (Laurel Heights Improvement Assn.
 
 v.
 
 Regents of University of California
 
 (1988) 47 Cal.3d 376, 392 [253 Cal.Rptr. 426, 764 P.2d 278], (hereafter
 
 Laurel Heights I),
 
 fn. and citation omitted; see also
 
 Western States Petroleum Assn.
 
 v.
 
 Superior Court
 
 (1995) 9 Cal.4th 559, 573 [38 Cal.Rptr.2d 139, 888 P.2d 1268].)
 

 “[T]he ultimate decision of whether to approve a project, be that decision right or wrong, is a nullity if based upon an EIR that does not provide the decision-makers, and the public, with the information about the project that is required by CEQA. The error is prejudicial if the failure to include relevant information precludes informed decision-making and informed public participation, thereby thwarting the statutory goals of the EIR process.
 

 “ ‘[T]he substantial evidence test applies to the court’s review of the agency’s factual determinations.’ . . . Substantial evidence means ‘enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached.’ ... ‘In applying the substantial evidence standard, “the reviewing court must resolve reasonable doubts in favor of the administrative finding and decision.” ’ . . . The appellate court’s role ‘is precisely the same as the trial court’s,’ and the lower court’s findings are not ‘conclusive on appeal.’ ”
 
 (San Joaquin Raptor/Wildlife Rescue Center
 
 v.
 
 County of Stanislaus
 
 (1994) 27 Cal.App.4th 713, 722 [32 Cal.Rptr.2d 704], citations omitted;
 
 Laurel Heights Improvement Assn.
 
 v.
 
 Regents of University of California
 
 (1993) 6 Cal.4th 1112, 1135 [26 Cal.Rptr.2d 231, 864 P.2d 502] (hereafter
 
 Laurel Heights II).)
 

 With respect to specific issues presented in this action, the interpretation and applicability of a statute is a question of law which requires an independent determination by the reviewing court.
 
 (East Peninsula Ed. Council, Inc.
 
 v.
 
 Palos Verdes Peninsula Unified School Dist.
 
 (1989) 210 Cal.App.3d 155, 165 [258 Cal.Rptr. 147].) On the other hand, the sufficiency of the scope of the evaluation of an environmental impact is subject to the substantial evidence test.
 
 (No Slo Transit, Inc.
 
 v.
 
 City of Long Beach
 
 (1987) 197 Cal.App.3d 241, 255 [242 Cal.Rptr. 760].)
 

 II
 

 Exhaustion of Administrative Remedy
 

 District contends all petitioners, with the exception of the Esselen Tribe, are precluded from bringing this action by virtue of the fact that they
 
 *1118
 
 failed to participate in the public comment period for the second supplemental draft EIR. At issue is the interpretation of section 21177 as amended in 1993. The District argues section 21177 does not allow belated challenges to a final EIR, the second addendum was the appropriate response to comments presented after close of the draft EIR comment period, and the petitioners who failed to raise objections to the second supplemental draft EIR should be dismissed for failure to exhaust their administrative remedy. Implicit in its argument is the assumption that because the public comment period for the final EIR was optional pursuant to CEQA Guidelines section 15089, subdivision (b),
 
 [6]
 
 the District was not required to address concerns raised during or after that period.
 

 Section 21177, as amended in 1993, provides in relevant part as follows:
 

 “(a) No action or proceeding may be brought pursuant to Section 21167 unless the alleged grounds for noncompliance with this division were presented to the public agency orally or in writing by any person during the public comment period provided by this division
 
 or
 
 prior to the close of the public hearing on the project before the issuance of the notice of determination.
 

 “(b) No person shall maintain an action or proceeding unless that person objected to the approval of the project orally or in writing during the public comment period provided by this division
 
 or
 
 prior to the close of the public hearing on the project before the issuance of the notice of determination.
 

 “(c) This section does not preclude any organization formed after the approval of a project from maintaining an action pursuant to Section 21167 if a member of that organization has complied with subdivision (b).” (Original italics.)
 

 Legal commentators have construed subdivision (a) of section 21177 as requiring that specific issues raised in litigation must first be raised during the administrative process, albeit not necessarily by the person who brings the litigation. (See, e.g., Remy, Guide to the Cal. Environmental
 
 *1119
 
 Quality Act (CEQA) (9th ed. 1996) p. 378.) Subdivision (b) of the statute restricts the availability of judicial review to parties who objected to the agency’s approval of the project. That is, a petitioner need not have articulated every basis for objecting to the project, but must have participated in the administrative process.
 
 (Ibid.)
 
 Thus, a petitioner who has taken part in the administrative process may assert any issues raised by other parties during the administrative proceedings.
 
 (Kings County Farm Bureau
 
 v.
 
 City of Hanford
 
 (1990) 221 Cal.App.3d 692, 734, fn. 13 [270 Cal.Rptr. 650];
 
 Resource Defense Fund
 
 v.
 
 Local Agency Formation Com.
 
 (1987) 191 Cal.App.3d 886, 894 [236 Cal.Rptr. 794].)
 

 Section 21177, subdivision (c) permits an organization formed after approval of the project to seek judicial review as long as a member of the organization objected prior to project approval.
 
 (Garrison
 
 v.
 
 Board of Directors
 
 (1995) 36 Cal.App.4th 1670, 1677 [43 Cal.Rptr.2d 214].)
 

 The obvious problem in section 21177 is the use of the disjunctive in subdivisions (a) and (b); i.e., objections must be raised by persons “during the public comment period provided by this division
 
 or
 
 prior to the close of the public hearing on the project before the issuance of the notice of determination.” In discussing the statute in its intended decision the trial court stated: “The statute should be interpreted to permit an action to be brought by any person who has objected up to or at the public hearing for issuance of the notice of determination, but
 
 only
 
 based on grounds for noncompliance for which the issue or factual support was raised prior to the close of the public hearing relating to the end of the comment period.” (Original italics.) The decision assumes, without so stating, that the “public comment period provided by this division” was the comment period for the final EIR, since the decision refers to the written comments by Charity Crane during the public comment period on the final EIR. The court’s interpretation extends the comment period through the certification hearing for a person, but limits the comment period for raising objections to mandatory or optional public comment periods. The District correctly argues there is no satisfactory justification for interpreting the language one way as applied to the grounds for objecting and a different way when applied to the person objecting.
 

 Nevertheless, we are unpersuaded by the District’s contention that the phrase “prior to the close of the public hearing on the project before the issuance of the notice of determination” as used in section 21177 must be interpreted as referring to a public hearing held during the public comment period for draft EIR’s. We are mindful that section 21003.1 mandates that
 
 *1120
 
 “[c]omments from the public . . . shall be made to lead agencies as soon as possible in the review of environmental documents ... to allow the lead agencies to identify, at the earliest possible time in the environmental review process, potential significant effects of a project, alternatives, and mitigation measures which would substantially reduce the effects.” We are also aware that the practice of allowing objectors to withhold objections, which could have been raised earlier in the environmental review process, until the last possible moment must be strongly disapproved. (See
 
 Citizens of Goleta Valley
 
 v.
 
 Board of Supervisors
 
 (1990) 52 Cal.3d 553, 568 [276 Cal.Rptr. 410, 801 P.2d 1161].)
 

 However, the term “notice of determination” refers to a brief notice that must be filed with the Office of Public Planning and Research and the county clerk of each county in which the project will be located whenever an agency determines to carry out a project. (See §§ 21108, subd. (a); 21152, subd. (a); Guidelines, § 15373.) The notice of determination must include among other things a “statement that an EIR was prepared and certified pursuant to the provisions of CEQA.” (Guidelines, § 15094, subd. (a)(5).) “The filing of the notice of determination and the posting on a list of such notice starts a 30-day statute of limitations on court challenges to the approval under CEQA.” (Guidelines, § 15094, subd. (f).) District’s construction of the statute not only ignores the second alternative of the statute, but renders the phrase “during the public comment period provided by this division,” which includes optional comment periods, meaningless.
 

 We think the problem was best described in 2 Kostka and Zischke, Practice Under the California Environmental Quality Act (Cont.Ed.Bar 1996) section 23.97, page 1013. The authors first observe that no court has held that delaying submission of comments until after the conclusion of the public comment period constitutes a failure to exhaust administrative remedies. They then state: “By amending the statute to indicate that the grounds for noncompliance must be asserted during the public comment period
 
 or
 
 before the close of the public hearing on the project, the legislature has probably made it more difficult to characterize a failure to raise CEQA defects during the comment period as a waiver or failure to exhaust. Indeed, the amendments to the statute could be interpreted to allow project opponents to delay raising any criticisms until the final hearing on the project. In the authors’ view, at least with respect to draft EIRs, this interpretation would conflict with the statutory scheme calling for criticisms to be raised in comments on the draft EIR so that the agency is given an adequate opportunity to respond in the final EIR.”
 
 (Ibid.)
 

 The authors conclude that the failure to participate in the public comment period for a draft EIR should be treated as a waiver of any claims relating to
 
 *1121
 
 the objection, unless the objection concerns the adequacy of the final EIR’s response to comments, or the objection could not have been made during the comment period. While the authors’ conclusion may have procedural merit, it sheds no light on what the Legislature meant by the phrase “close of the public hearing on the project before the issuance of the notice of determination.” Clearly, there is no issuance of the notice of determination immediately following the public comment period for draft EIR’s.
 

 “The Legislature is presumed to have meant what it said, and the plain meaning of the language will govern the interpretation of the statute.”
 
 (In re Khalid H.
 
 (1992) 6 Cal.App.4th 733, 736 [8 Cal.Rptr.2d 414]; see also
 
 Craig
 
 v.
 
 City of Poway
 
 (1994) 28 Cal.App.4th 319, 337 [33 Cal.Rptr.2d 528].) Accordingly, this court is without authority to disregard a portion of the language of section 21177.
 
 (William Dal Porto & Sons, Inc.
 
 v.
 
 Agricultural Labor Relations Bd.
 
 (1987) 191 Cal.App.3d 1195, 1204 [237 Cal.Rptr. 206].) As we read section 21177, any alleged grounds for noncompliance with CEQA provisions may be raised by any person prior to the close of the public hearing on the project before the issuance of the notice of determination.
 

 Any challenge to this interpretation should be addressed to the Legislature. If the time for exhausting administrative remedies is to be limited to the “public comment period provided by this division,” the Legislature also should clarify whether this includes voluntary comment periods for final EIR’s.
 

 Based on our reading of section 21177, we conclude that any party may bring an action pursuant to section 21167 if it has raised an objection to the adequacy of an EIR prior to certification. According, we find all petitioners have exhausted their administrative remedies in that each raised concerns about the inadequacy of the final EIR prior to certification.
 

 in
 

 Adequacy of EIR
 

 The trial court found the final EIR to be inadequate in its description of the project site and the project’s impacts on viticulture, particularly in the areas of traffic, air quality and climate. The District disputes these findings, contending the administrative record contains substantial evidence to find the EIR adequate. We disagree.
 

 Guidelines section 15125 provides in relevant part: “An EIR must include a description of the environment in the vicinity of the project, as it exists
 
 *1122
 
 before the commencement of the project, from both a local and regional perspective. The description shall be no longer than is necessary to an understanding of the significant effects of the proposed project and its alternatives. (a) Knowledge of the regional setting is critical to the assessment of environmental impacts. Special emphasis should be placed on environmental resources that are rare or unique to that region and would be affected by the project.”
 

 The “Land Use, Planning and Recreation” chapter of the final EIR describes the land uses surrounding the project site as consisting: “generally of undeveloped forested open space. The Wilderness Area stretches further south and adjacent to the project site. This area is undeveloped with some hiking trails and gravel and dirt roads. Cal-Am also owns some property to the south of the project site. Land use to the north includes very low density rural residential properties and limited grazing.
 
 East and west of the project site is mostly undeveloped land with some grazing, agriculture and scattered rural residential use.
 
 No development has been proposed for the project site and surrounding area.” The “Climate and Air Quality” chapter of the final EIR describes the area as
 
 “sparsely populated, with no industry other than several vineyards in the Cachagua
 
 Valley.” The italicized sentences constitute the only references in the EIR to viticulture or wineries, despite the fact that the District had previously been advised of the importance of viticulture in the Cachagua area by Crane and Galante.
 

 Due to the inadequate description of the environmental setting for the project, a proper analysis of project impacts was impossible. CEQA requires that an EIR “identify and focus on the significant environmental effects of the proposed project. Direct and indirect significant effects of the project on the environment shall be clearly identified and described, giving due consideration to both the short-term and long-term effects. The discussion should include relevant specifics of the area, the resources involved, physical changes, alterations to ecological systems, and changes induced in . . . the human use of the land (including commercial and residential development), health and safety problems caused by the physical changes, and other aspects of the resource base such as water, scenic quality, and public services . . . .” (Guidelines, § 15126, subd. (a).)
 

 Petitioners argued and the trial court agreed that a particularly serious omission in the EIR was its failure to identify or analyze the consequences of the potential introduction of the wine grape pest phylloxera spread by cars and trucks carrying small amounts of infected soils from other areas. Evidence was presented by Jack Galante that the introduction of phylloxera
 
 *1123
 
 would cause injury to the viticulture industry in the dam environs, since it would necessitate the replanting of vineyards.
 

 Likewise, the EIR fails to discuss the additional traffic and construction-related impacts affecting the area. These include the impact of fugitive dust on viticultural and horticultural enterprises. A related impact is the fact that grapevines and garden roses are highly susceptible to the Pacific spider mite that occurs where dust is a problem.
 

 The final EIR acknowledges that impacts from fugitive dust will be significant and unavoidable, even with mitigation measures. However, this acknowledgment is inadequate. “An EIR should be prepared with a sufficient degree of analysis to provide decisionmakers with information which enables them to make a decision which intelligently takes account of environmental consequences.” (Guidelines, § 15151.) As previously stated, Guidelines section 15126 requires a more detailed account of the impacts. In this case, a more detailed analysis of how adverse the impact will be is required.
 
 (Santiago County Water Dist.
 
 v.
 
 County of Orange
 
 (1981) 118 Cal.App.3d 818, 831 [173 Cal.Rptr. 602].)
 

 Finally, the petitioners argued and the court agreed that the EIR was inadequate for failing to address, analyze, or mitigate the potential climatic influences of the reservoir construction on the Cachagua Valley and its agricultural land uses.
 

 The final EIR acknowledges that the operation of a large reservoir could alter the climate in the vicinity of the reservoir. More specifically it states: “While a large reservoir would have no effect on regional climatic conditions, there could be a slight alteration of the climate in its immediate vicinity. The local effects stem from the fact that the large body of water would exert a moderating influence on temperature. During hot summer days, the mass of cool water in the reservoir would lower the air temperature above it. On cold winter nights, the water mass would warm the air. Studies at other reservoirs suggest that the moderating influence would result in air temperatures downwind of the reservoir less than 1 °F different from upwind air temperatures most of the time, although the temperature difference could be as much as 5 °F under extreme circumstances. The humidity of air passing over the water may also be increased slightly. No reports were found in the literature that indicate that the humidity rise is sufficient to increase the frequency of fog. Impacts to the local climate are expected to be less than significant.” The EIR found no mitigation measure required or recommended.
 

 
 *1124
 
 According to Galante’s letter, the final EIR “fails to take into account the highly susceptible nature of the local agriculture. The analysis is totally inadequate since the local microclimate is not even addressed, even though the data readily exists. In addition, the only analysis on temperature and humidity contrasts referenced was an outdated study from 1967! [<]fl There are three areas that could lead to very significant adverse impacts to agriculture that directly relate to the reservoir construction: the potential increase of humidity, frost generation, and increased potential habitat for the leafhopper.” The letter then discusses in more detail the adverse impacts to commercial viability of wine grapes and roses as well as potential significant impacts from frost and a cooler, extended growing season. As the trial court stated in its intended decision, the EIR simply fails to address potential impacts related to viticulture.
 

 In conclusion, we agree that the final EIR is inadequate as it relates to the issue of viticulture. The defective EIR was not cured by the second addendum, since it was agreed the adequacy of that document was not before the court. Moreover, everything that is required to be considered in an EIR must be contained in that formal report.
 
 (Santiago County Water Dist.
 
 v.
 
 County of Orange, supra,
 
 118 Cal.App.3d at p. 831.) Material presented eight months after certification may not be considered on whether certification was proper.
 

 IV
 

 Court’s Direction
 

 The District contends it should not have been directed to prepare a supplemental EIR as the method by which it makes its return to the writ of mandate. It objects to having its discretion restricted to this single method of complying with the writ. Citing Guidelines sections 15162 through 15164, it maintains it should have the choice of preparing a subsequent or supplemental EIR, or an addendum to the EIR. There is no merit to the contention.
 

 All three cited guidelines refer to preparation of documents after the certification of an EIR. These documents are prepared only when, subsequent to certification, changed circumstances occur or when new information, which was not known and could not have been known when the original EIR was certified, becomes available. (See § 21166;
 
 Laurel Heights II, supra,
 
 6 Cal.4th at p. 1125.) Moreover, an addendum is proper “if only minor technical changes or additions” are needed to address changes which have occurred subsequent to preparation of a “previously certified EIR.” (Guidelines, § 15164.) In this case, petitioners are challenging the certification of the original EIR. Consequently, since the original EIR is inadequate,
 
 *1125
 
 procedures for addressing postcertification changed circumstances or new information are inappropriate. The District has no discretion to cure an inadequate EIR by means of a subsequent EIR or an addendum. The judgment ordering the District to void its certification of the EIR and to prepare a supplemental EIR was correct. (See e.g.,
 
 City of Santee
 
 v.
 
 County of San Diego
 
 (1989) 214 Cal.App.3d 1438, 1457 [263 Cal.Rptr. 340] [mandate ordering county to set aside certification of inadequate EIR and to prepare and certify new EIR].)
 

 V
 

 Attorney’s Fees
 

 The District contends it was improper to award petitioners attorney’s fees pursuant to the private attorney general provisions of Code of Civil Procedure section 1021.5,
 
 [7]
 
 since petitioners have a significant financial interest in the outcome of this case.
 

 Entitlement to fees under Code of Civil Procedure section 1021.5 requires a showing that the litigation: “(1) served to vindicate an important public right; (2) conferred a significant benefit on the general public or a large class of persons; and (3) imposed a financial burden on plaintiffs which was out of proportion to their individual stake in the matter.”
 
 (Baggett
 
 v.
 
 Gates
 
 (1982) 32 Cal.3d 128, 142 [185 Cal.Rptr. 232, 649 P.2d 874].) The decision whether to award attorney fees pursuant to this statute lies within the discretion of the trial court and will not be disturbed on appeal absent a prejudicial abuse of discretion resulting in a manifest miscarriage of justice.
 
 (Id.
 
 at pp. 142-143.)
 

 “Calculation of attorney’s fees under Code of Civil Procedure section 1021.5 is to be done in accordance with the guidelines set forth in
 
 Serrano
 
 v.
 
 Priest
 
 (1977) 20 Cal.3d 25 [141 Cal.Rptr. 315, 569 P.2d 1303]. ... The trial court is to first determine a ‘touchstone’ or ‘lodestar’ figure based on careful computation of the time spent and a reasonable hourly compensation. The figure may be increased or decreased by use of a multiplier after the trial court has considered other factors.”
 
 (San Bernardino Valley Audubon Society,
 
 
 *1126
 

 Inc.
 
 v.
 
 County of San Bernardino
 
 (1984) 155 Cal.App.3d 738, 755 [202 Cal.Rptr. 423], citation omitted.)
 

 In this case, the trial court recognized that the petitioners were pursuing both a significant public interest and a private interest. It therefore granted petitioners’ motion for reasonable attorney’s fees in the lodestar amount of $101,418, plus a multiplier of $44,598. Attorney’s fees for the fee motion were granted in the amount of $11,112 and costs were awarded in the amount of $1,309. The total sum of $158,427 was then reduced by 50 percent. The total amount of attorney’s fees and costs awarded to petitioners was $79,218.50.
 

 The District takes the position that the trial court found that petitioners failed to show that the necessity and financial burden imposed on them was out of proportion to their individual stake in the action, the third requirement for awarding attorney’s fees under Code of Civil Procedure section 1021.5. Citing
 
 Satrap
 
 v.
 
 Pacific Gas & Electric Co.
 
 (1996) 42 Cal.App.4th 72, 81 [49 Cal.Rptr .2d 348], it maintains where the court finds that one of the statutory criteria is not met, award of attorney’s fees is improper.
 

 We reject the District’s assumption that the trial court made a specific finding as to the third criterion of Code of Civil Procedure section 1021.5 award when it stated in the order granting fees, “In light of the significant financial interest in the outcome of this case by the petitioners involved in the viticulture industry, the Court finds that an apportionment of fees is appropriate, and reduces the award by a factor of 50% for this sole reason.” Prior to the above quoted statement, the order states that “[t]he consideration of impacts and mitigation to Cachagua viticulture and upholding of the requirements of the California Environmental Quality Act enforce an important right affecting the public interest, confer a significant benefit upon the people of the Carmel Valley and Monterey County, and the necessity of private enforcement is such as to make an award of fees appropriate.”
 

 In
 
 Woodland Hills Residents Assn., Inc.
 
 v.
 
 City Council
 
 (1979) 23 Cal.3d 917, 941 [154 Cal.Rptr. 503, 593 P.2d 200], our Supreme Court held that an award on the private attorney general theory is appropriate when the cost of the plaintiff’s legal victory transcends his personal interest. That is, attorney’s fees may be awarded when the necessity for pursuing the lawsuit placed a burden on the plaintiff out of proportion to his individual stake in the matter.
 

 “Entitlement to such an award does not turn on a balance of the litigant’s private interests against those of the public but on a comparison of the
 
 *1127
 
 litigant’s private interests with the anticipated costs of suit. . . . Section 1021.5 is intended as a ‘bounty’ for pursuing public interest litigation, not a reward for litigants motivated by their own interests who coincidentally serve the public. . . . ‘The private attorney general theory recognizes citizens frequently have common interests of significant societal importance, but which do not involve any individual’s financial interests to the extent necessary to encourage private litigation to enforce the right. ... To encourage such suits, attorneys fees are awarded when a significant public benefit is conferred through litigation pursued by one whose personal stake is insufficient to otherwise encourage the action.’ ”
 
 (California Licensed Foresters Assn.
 
 v.
 
 State Bd. of Forestry
 
 (1994) 30 Cal.App.4th 562, 570 [35 Cal.Rptr.2d 396], citations omitted.)
 

 In
 
 California Licensed Foresters Assn.,
 
 a licensed foresters association brought an action against the California State Board of Forestry. The association challenged the board’s emergency regulations, which effectively stopped the approval of timber harvest plans for at least four months, on the grounds that the regulations adversely affected the livelihood of its members and were not supported by a bona fide emergency. After a voluntary dismissal of the action, the trial court found the association was entitled to fees pursuant to the private attorney general doctrine. The Court of Appeal reversed the award of attorney’s fees, finding the association had a significant pecuniary interest in eliminating the emergency regulations and the costs of litigation were not out of proportion to its stake in the litigation.
 
 (California Licensed Foresters Assn.
 
 v.
 
 State Bd. of Forestry, supra,
 
 30 Cal.App.4th at p. 574.)
 

 In reaching its decision, the court distinguished the facts in its case from those in
 
 Planned Parenthood
 
 v.
 
 Aakhus
 
 (1993) 14 Cal.App.4th 162 [17 Cal.Rptr.2d 510], in which the Court of Appeal upheld an award of attorney’s fees to an abortion clinic which had sued to enjoin interruption of its business by protesters. While acknowledging that the clinic had a business motive to file the action, the court concluded the interest of the clinic and its clients were “mutual and inseparable,” and the action could not be characterized as a “self-serving, private dispute” commenced by the clinic “to protect its own pocketbook.”
 
 (Id.
 
 at p. 173.)
 

 In the present action, petitioners Galante Vineyards, Rancho Galante, Bemardus, and Dumey Vineyards are probably the greatest beneficiaries of the writ ordering a focused supplemental EIR on viticultural issues. However, there is no direct pecuniary benefit to petitioners in the judgment. In addition, any future money advantage for petitioners is speculative. Both
 
 *1128
 
 these factors tend to favor a grant of attorney’s fees. (See
 
 Citizens Against Rent Control
 
 v.
 
 City of Berkeley
 
 (1986) 181 Cal.App.3d 213, 230-231 [226 Cal.Rptr. 265].) Thus, the question of whether the cost of petitioners’ legal victory transcends their personal interests was a close one.
 

 We find no abuse of discretion in the trial court solving this problem by doing what the District suggested in its opposition to petitioners’ motion for attorney’s fees; i.e., reducing fees to reflect the financial interest of four of the six petitioners. To the extent that the District is arguing it was improper to award any fees prior to reaching a determination on the third prerequisite to an award of fees under the private attorney general doctrine, it has invited the error.
 

 Disposition
 

 The judgment is affirmed.
 

 Cottle, P. J., and Bamattre-Manoukian, J., concurred.
 

 [1]
 

 Cal-Am is the utility company responsible for supplying water to District residents. On July 6, 1995, the State Water Resources Control Board (SWRCB) issued Order No. WR 95-10 which reduced Cal-Am’s right to divert water from the Carmel River and ordered Cal-Am to immediately identify alternative water supply sources. In a November 7, 1995, public vote, the District’s constituents failed to approve the District’s financing plan to the New Los Padres Dam and Reservoir project. Thereafter, Cal-Am announced that it would privately finance construction of the dam under a different name, the Carmel River Dam. Accordingly, Cal-Am now has a direct interest in the outcome of this action.
 

 [2]
 

 All further statutory references are to the Public Resources Code unless otherwise indicated.
 

 [3]
 

 Before the EIR was complete, the United States Army Corps of Engineers informed the District that a federal Clean Water Act section 404 permit for the project was required. To obtain the section 404 permit, the District needed to prepare a federal environmental impact statement (EIS) pursuant to the National Environmental Protection Act (NEPA).
 

 [4]
 

 In June 1993, voters within the District boundaries failed to authorize financing or construction of the desalination facility.
 

 [5]
 

 The District indicated that it would be interested in an informal meeting with Galante and other Cachagua vineyard owners to better understand their concerns, clarify perceptions about the proposed dam, and discuss means to reduce potential adverse effects during project construction.
 

 [6]
 

 Guidelines section 15089, subdivision (b) states in relevant part: “Lead Agencies
 
 may
 
 provide an opportunity for review of the final EIR by the public or by commenting agencies before approving the project.” (Italics added.)
 

 All references to “Guidelines” are to the CEQA Guidelines, which implement the provisions of CEQA. (Cal. Code Regs., tit. 14, § 15000 et seq.) The Guidelines state, “These Guidelines are binding on all public agencies in California.” (Guidelines, § 15000.) There is a conflict of authority on whether the Guidelines are regulatory mandates or only aids to interpreting CEQA. (See
 
 Laurel Heights I, supra,
 
 47 Cal.3d at p. 391, fn. 2.)
 

 [7]
 

 Code of Civil Procedure section 1021.5 provides in relevant part: “Upon motion, a court may award attorneys’ fees to a successful party against one of more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement... are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any.”