Filed 12/2/22  Stop Toxic Housing in Pasadena v. Dept. of Toxic Substances Control CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

|  |  |
|---|---|
| STOP TOXIC HOUSING IN PASADENA, INC., <br><br> Petitioner and Appellant, <br><br> v. <br><br> DEPARTMENT OF TOXIC SUBSTANCES CONTROL, <br><br> Respondent; <br><br> SPACE BANK LTD and PASADENA GATEWAY, LLC, <br><br> Real Parties in Interest and Respondents. | B308608 <br><br> (Los Angeles County Super. Ct. No.19STCP04909) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Daniel S. Murphy, Judge.  Affirmed.

Call & Jensen, Anurita S. Varma and Joshua G. Simon for Petitioner and Appellant.

Rob Bonta, Attorney General, Edward H. Ochoa, Acting Chief Assistant Attorney General, David A. Zonana, Supervising Deputy Attorney General,

and Shannon Clark, Deputy Attorney General, for Respondent Department of Toxic Substances Control.

Snell & Wilmer, Jing (Jenny) Hua and Sean M. Sherlock for Real Party in Interest and Respondent Pasadena Gateway LLC.

Parker, Milliken, Clark, O'Hara & Samuelian, Pedram Mazgani and Gary A. Meyer for Real Party in Interest and Respondent Space Bank Ltd.

—————————————————

Stop Toxic Housing in Pasadena, Inc. (STHIP) appeals from the judgment entered after the denial of its petition for writ of mandate. The mandate petition sought to stop a mixed-use project (Project) proposed by Pasadena Gateway LLC (Pasadena Gateway) at a site on Foothill Boulevard in Pasadena (Site) that had a history of contamination as a result of military use dating from the 1940s. Under the California Environmental Quality Act (CEQA), the City of Pasadena (City) approved a Sustainable Communities Environmental Assessment (SCEA; Pub. Res. Code, §§ 21155, et seq.)[1] that included the approval of the Department of Toxic Substances Control's (DTSC) Removal Action Workplan (RAW) to address the contamination.[2]

STHIP objected to the Project and the RAW under both CEQA and the Hazardous Substances Account Act (HSAA) (Health & Saf. Code, §§ 25300, et seq.). STHIP principally contended that changes to the final RAW based on the discovery of additional contaminants rendered the Project description

_____

[1]  All statutory references herein are the Public Resources Code unless otherwise noted.

[2]  To aid in understanding all the acronyms used in the record and this opinion, we include a glossary as an appendix at the end of our opinion.

2

unstable, and that insufficient evidence supports the RAW's testing and remediation plans, rendering them inadequate. The trial court denied the petition, and we affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The Project was proposed under the Sustainable Communities and Climate Protection Act of 2008 (Act) as a "transit priority project" because it was located near the Sierra Madre Villa Metro station. The Act seeks to integrate transportation and land use planning to reduce greenhouse gas emissions. (Stats. 2008, ch. 728, § 1.) One type of development under the Act designed to reduce greenhouse gas emissions from motor vehicles is a "transit priority project." Such a project is a development that contains at least 50 percent residential use, provides a minimum density of at least 20 units per acre, and is located within one-half mile of a major transit stop or transit corridor. (§ 21155, subd. (b).)

To encourage the development of transit priority projects, the Act limits the extent of environmental review that a local agency must perform under CEQA to approve them. Under the Act, if the project meets several criteria, the local agency may review the project's environmental effects in a streamlined manner using an SCEA. (§§ 21155, subd. (a), 21155.2, subds. (a), (b); see *Sacramentans for Fair Planning v. City of Sacramento* (2019) 37 Cal.App.5th 698, 706 (*Sacramentans for Fair Planning*).)

## I.    FACTUAL SUMMARY

Due the contamination of the Site, DTSC prepared a remedial investigation/feasibility study (RI/FS) under Health and Safety Code section 25356.1.5, subdivision (a)(1), which requires adherence to the National Oil

3

and Hazardous Substances Contingency Plan (NCP) (40 C.F.R. §§ 300.1, et seq.) (see *Otay Land Co., LLC v. U.E. Limited, L.P.* (2017) 15 Cal.App.5th 806, 866 [HSAA requires compliance with NCP]).  As a result of the findings generated by the RI/FS, DTSC prepared a RAW to deal with the contaminants at the Site.

A.     *The Project*

The Project will be built at 3200 East Foothill Boulevard in Pasadena. The Project is a mixed-use development consisting of 550 apartment units, 9,800 square feet of retail space, parking structures, and landscaping.  The parties do not dispute the Project qualifies as a "transit priority project" under section 21155 because it is located near the Sierra Madre Metro Station.

B.     *The Site's History*

The Site is approximately 9.15 acres, which includes a small adjacent parcel west of North Kinneloa Avenue.  The Site is currently occupied by numerous World War II era former Navy buildings that have been divided into small storage units and small commercial businesses.  The Site was used from 1943 to 1973 by the United States Navy (the Naval Information Research Foundation Undersea Center) and the California Institute of Technology for research and development of weapons technology.[3]  Although

---

[3]     The facility has been known by several other names at different times in its history including Foothill Plant of the Pasadena Annex, Pasadena Naval Ordnance Testing Station, United States Naval Ordinance Test Station, Naval Undersea Research and Development Center, and Naval Undersea Center.

4

rockets and torpedoes were assembled at the Site, they were shipped to other locations for testing.

Most of the buildings currently on the Site are one- or two-story, primarily metal and wood framed structures typical of old buildings found on a military facility. One of the buildings is a newer style, two-story, concrete tilt-up, steel framed structure built in the 1970s. Areas of the Site outside of the building footprints are primarily asphalt or concrete paved with the exception of a small, landscaped area surrounding the 1970s building.

In 1978, the United States Government sold the property to Space Bank. Currently, the Site is used by Space Bank Mini Storage as a storage facility, and is occupied by 27 buildings, most of them consisting of the buildings that had been built by the Navy from 1945 to 1954. Tenants at the Site have included woodworking businesses, landscapers, building contractors, and window awning assembly, as well as office tenants.

C.    *Previous Environmental Evaluations of the Site*

Since 1991, approximately 22 environmental assessments of the Site have been conducted. In 1991, the United States Army Corps. of Engineers initiated contamination assessments of the Site. In 1998, a 2,000-gallon gasoline tank and two 200-gallon diesel tanks were removed in a "clean closure."

In 1999, the Army evaluated the storm drain system, a former paint and chemical storage building, an administration lab and torpedo assembly building, a sanitary sewer pumping station, and an incinerator. The Army recommended, among other things, removal of storm drainage dry pits (containing arsenic, lead, semi-volatile organic compounds (SVOCs) and total petroleum hydrocarbons (TPHs)), removal of sediment in floor drains

5

(containing metals and TPHs); and removal of sediment in catchment basins (containing arsenic, lead, mercury, thallium, SVOCs and TPHs). A 2007 study of soil vapor found PCE, carbon tetrachloride, and freon. However, contaminants of low mobility, including metals, VOCs, polycyclic aromatic hydrocarbons (PAHs), polychlorinated biphenyls (PCBs) and heavier hydrocarbons were unlikely to be a source of groundwater contamination.

Between 2003 and 2007, the DTSC issued cleanup orders and negotiated with the Army to conduct further investigation at the Site.

D.     *Prospective Purchaser Agreement and Covenant Not to Sue*

In 2007, Pasadena Gateway agreed with DTSC and the California Regional Water Quality Control Board to perform certain environmental cleanup of the Site under DTSC oversight in exchange for a covenant not to sue.[4] Pasadena Gateway and DTSC formally entered into an Agreement and Covenant Not to Sue in November 2011 (later amended in 2017) (Agreement). The parties filed a consent decree in the United States District Court for the Central District of California in June 2014.

The Agreement required Pasadena Gateway to undertake a RI/FS, conduct groundwater testing, and conduct soil and vapor response consistent with the HSAA and the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA; 42 U.S.C. §§ 9601, et seq.; see 42 U.S.C. § 9605; 40 C.F.R. § 300.400, et seq.)

---

[4]     DTSC has authority to enter into agreements whereby DTSC covenants not to sue or assert claims for environmental remediation against prospective purchasers of environmentally impacted properties if such agreements are sufficiently in the public interest. (Health & Saf. Code, §§ 58009, 58010.)

E.  *The RI/FS*

1.  *Relevant Legal Requirements for RI/FS*

Under the NCP, DTSC must conduct a RI/FS before choosing a response action.  The end goal of the RI/FS process is "to assess site conditions and evaluate alternatives to the extent necessary to select a remedy."  (40 C.F.R. § 300.430, subd. (a)(2).)  The first step is the RI, which seeks to "collect data necessary to adequately characterize the site for the purpose of developing and evaluating effective remedial alternatives."  (40 C.F.R. § 300.430, subd. (d)(1).)  DTSC is given significant leeway to develop a RI process specific to the site.  (*Ibid*; see *Emhart Industries, Inc. v. New Englander Container Company* (D.R.I. 2017) 274 F.Supp.3d 30, 39–40 (*Emhart Industries*).)

DTSC transitions from the RI process of collecting data to the FS process of selecting a remedy.  "The national goal of the remedy selection process is to select remedies that are protective of human health and the environment, that maintain protection over time, and that minimize untreated waste."  (40 C.F.R. § 300.430, subd. (a)(1)(i); *Emhart Industries, supra,* 274 F.Supp.3d at pp. 39–40.)

While the RI and FS are labeled as separate steps in the process, the RI does not end when the FS begins.  Instead, "'the RI and FS are interactive processes that are conducted concurrently,'" such that "'field investigation activities will be ongoing during the development and screening of remedial action alternatives.'"  (*Emhart Industries, supra,* 274 F.Supp.3d at p. 40, fn. 4; 40 C.F.R. § 300.430, subd. (e)(1) [development of alternatives shall be fully integrated with the site characterization activities of the remedial investigation and preliminary remediation goals should be modified, as necessary, as more information becomes available during the RI/FS].)

7

The Environmental Protection Agency (EPA) has issued guidance for the preparation of a RI/FS (EPA Guidance). The EPA Guidance counsels that "[t]he remedial investigation and feasibility study (RI/FS) process as outlined in this guidance represents the methodology that the Superfund program has established for characterizing the nature and extent of risks posed by uncontrolled hazardous waste sites and for evaluating potential remedial options. This approach should be viewed as a dynamic, flexible process that can and should be tailored to specific circumstances of individual sites: it is not a rigid step-by-step approach that must be conducted identically at every site. The project manager's central responsibility is to determine how best to use the flexibility built into the process to conduct an efficient and effective RI/FS that achieves high quality results in a timely and cost-effective manner. A significant challenge project managers face in effectively managing an RI/FS is the inherent uncertainties associated with the remediation of uncontrolled hazardous waste sites. These uncertainties can be numerous, ranging from potential unknowns regarding site hydrogeology and the actual extent of contamination, to the performance of treatment and engineering controls being considered as part of the remedial strategy. While these uncertainties foster a natural desire to want to know more, this desire competes with the Superfund program's mandate to perform cleanups within designated schedules. [¶] The objective of the RI/FS process is not the unobtainable goal of removing all uncertainty, but rather to gather information sufficient to support an informed risk management decision regarding which remedy appears to be most appropriate for a given site. The appropriate level of analysis to meet this objective can only be reached through constant strategic thinking and careful planning concerning the essential data needed to reach a remedy selection decision. As hypotheses

8

are tested and either rejected or confirmed, adjustments or choices as to the appropriate course for further investigations and analyses are required. These choices, like the remedy selection itself, involve the balancing of a wide variety of factors and the exercise of best professional judgment." (EPA Guidance, pp. 1–3.)

    2.  *The RI/FS*

The RI/FS, dated November 2017, evaluated the extent of contamination at the Site in connection with its historical usage, and considered whether sufficient environmental investigations had been conducted to address the possible areas of contamination. The FS was conducted to screen options for remediation at the Site and to determine which remedial options most adequately suit the project when weighing factors such as effectiveness, cost, and implementation.

The RI/FS reviewed the 22 environmental assessments made at the property since 1991, which included 382 soil samples and 157 soil gas samples. Those investigations had found concentrations of heavy metals (lead, arsenic, thallium and mercury), TPHs, and PAHs in the soil. Volatile organic compounds (VOCs) were found in the soil and soil vapor. The storm water system had the highest concentration of contamination, and soil vapor contamination was highest in the southern and eastern areas of the Site. Those areas under buildings that could not be accessed would be sampled once existing structures were demolished.

The RI/FS conducted a human-health screening evaluation to determine the risk of exposure from soil or air during construction, as well as post-construction. The RI/FS concluded any such risk would be eliminated by Site development due to the paving of the Site.

9

With respect to groundwater, there was limited data because none of the sampling reached the groundwater. There are no surface water features in the planned development of the Site. Further, groundwater under the Site is expected to be greater than 300 feet deep and is not a planned source of drinking water or any other use for future Site development.

However, the RI/FS identified groundwater as a potential exposure pathway. Pursuant to the 2017 amendment to the Agreement, Pasadena Gateway will prepare a groundwater investigation workplan and undertake groundwater sampling concurrently with the completion of the RAW. The groundwater sampling requires installation of four monitoring wells to depths beyond 300 feet, as well as 17 soil samples at the well sites, consistent with EPA methods. Additionally, the investigation workplan will include a Health Risk Assessment which will evaluate whether the groundwater monitoring results reflect levels that either exceed the appliable or relevant and appropriate requirements (ARARs) or pose a potential human health risk.

The RI/FS recommended excavating the sources of soil and soil gas contamination. Excavation would include the storm water drainage system and soil hotspots, with disposal being made offsite.

F.    *The RAW*

The Project required approval of a RAW by DTSC to allow for the removal of on-site contaminants to levels that would protect human health and the environment.[5]

---

[5]    The RAW is discussed in greater detail in connection with DTSC's response to public commentary.

10

The RAW, dated December 20, 2017, was prepared by the firm of Ninyo & Moore for Pasadena Gateway and was to be submitted to DTSC for the mitigation of environmental impacts. The RAW was designed to identify and evaluate removal approaches to clean up the Site for suitability as a future residential and commercial project. Licensed engineers prepared the RAW, and the RAW was reviewed by DTSC and by an independent environmental consulting firm hired by the City (Alta Environmental).

The RAW observed that historical research and development operations by the Navy resulted in releases of VOCs, heavy metals, and petroleum hydrocarbons into soil, storm drains and seepage pits at the Site. The RAW proposed excavation, removal and disposal of impacted soils to off-site permitted facilities. The proposed removal action was estimated to take 80 days, and a total of 745 cubic yards (approximately 55 truckloads) of contaminated soil would be removed and disposed of at permitted facilities. As an integral part of the removal actions, confirmation soil sampling, a soil gas survey and a site-specific health risk assessment will be conducted to confirm that the Site is suitable for residential use prior to construction.

The RAW also established cleanup standards that ARARs for the contaminants identified at the Site. Chemical-specific ARARs are health- or risk-based cleanup standards or methodologies that, when applied to site-specific conditions, result in the development of cleanup standards for contaminants. Chemical-specific ARARs are numerical values or methodologies that, when applied to site-specific conditions, establish the allowable amount or concentration of a chemical that may be found in, or discharged to, the ambient environment, and will form the basis for Site-specific cleanup goals. The RAW set forth that the published screening levels

11

(SLs) from the EPA or DTSC will be used as ARARs for assessing successful mitigation of areas of concern (AOCs) through confirmation sampling.

The RAW summarized previous environmental studies at the Site. Based upon those studies, the RAW found four AOCs at the Site: (1) the Site's storm drain system, which was contaminated by metals and PAHs (AOC1); (2) five known and two suspected storm water seepage pits, which are contaminated by metals, petroleum hydrocarbons and PAHs (AOC2); (3) four additional hotspots contaminated by metals, petroleum hydrocarbons, and VOCs (AOC3); and (4) low-level VOCs in soil gas throughout the Site (AOC4).

The RAW proposed that AOCs would be excavated to below published screening levels. If necessary, AOC4 would be mitigated based on the results of a soil gas survey and human health risk assessment to be performed after the demolition of existing structures and completion of remediation of AOCs 1 through 3. If necessary, vapor mitigation systems (VMS) will be installed.

The RAW evaluated three alternatives to achieve removal goals, ultimately approving a second alternative. This alternative required excavation of the storm water system and sewage pits, as well as the contaminated soil in and around them; excavating the contaminated soil in the hot spots located in other areas; and conducting a soil gas survey, human-health risk assessment, and vapor instruction mitigation.

All buildings at the Site will be demolished. After demolition, VOCs in soil gas will be evaluated for human health risk and to determine that the Site is suitable for development.

With respect to groundwater, the depth to groundwater at the Site is expected to be greater than 300 feet below ground. The RAW specified that "[g]roundwater conditions are generally unknown at this Site. Under the Porter-Cologne Water Quality Act, further investigation may be warranted

12

and reportable to the Los Angeles Regional Water Quality Control Board and to DTSC.  The workplan to investigate possible contamination will be submitted to DTSC (as lead agency for this Project) for review and approval concurrent with redevelopment construction."

G.    *The SCEA and City Certification*

The City issued its SCEA in February 2018.  The City held a public comment period on the SCEA from February 8, 2018 through March 26, 2018.  The SCEA found that impacts stemming from hazardous substances will be reduced below levels of significance through implementation of the activities outlined in the RI/FS and the RAW.  The City required Pasadena Gateway to obtain DTSC's approval on the RAW to remove soil contamination on the Site prior to its development.

In July 2018, the City certified the SCEA and approved the Project.

H.    *Comments on the RAW and DTSC Response*

On March 8, 2019, DTSC gave public notice of the RAW and held a public meeting on March 28, 2019.  Present at the meeting were the DTSC Project manager, toxicologist, geologist, and others who explained the RAW and answered questions.

DTSC reviewed written comments on the RAW and responded.  DTSC identified five major categories of comments, and responded as follows:

1. *Substance of Comments: "The Site had not been adequately investigated for explosives and thus the investigation needed to be reopened"*

DTSC response:  DTSC concluded that the "Site is adequately characterized for the proposed removal action."  DTSC found the available historical Navy records indicated that the Site was used primarily for

13

research and development activities which included machining, assembling and hydrodynamic testing of rockets and torpedo prototypes, and electronic guidance systems and components.

Since 1999, DTSC has overseen environmental investigations with 382 soil samples and 157 soil gas samples collected throughout the Site at locations that were deemed to be most likely impacted with chemicals associated with the known operations. Soil samples were collected from storage sheds, laboratories floor drains, vehicle maintenance area, sewer system, storm drains, and seepage pits. Laboratory analyses were conducted for a wide range of chemicals associated with historical operations, which included: VOCs, SVOCs, PAHs, TPHs, dioxins and furans, PCBs, heavy metals (chromium, lead, arsenic, etc.), N-nitroso dimethylamine (NDMA), perchlorate, and Otto fuel.[6]

There was no evidence that functional tests of weapon systems were conducted at the Site. Navy historical records indicate that functional live-fire weapons testing was conducted at the Navy's China Lake facility and propulsion tests were conducted at Morris Dam. Due to the absence of records regarding laboratory-scale explosives use in the facility's combustion laboratories, a work plan to sample Site soil for hexahydro-1,3,5-trinitro-1, 3, 5-triazine (RDX) and 2,4,6-trinitrotoluene (TNT) (commonly used explosives) along with their degradation products would take place as part of removal action activities. If these compounds are detected above screening levels, the current health-protective cleanup standards will be used for any necessary cleanup activities to protect future residential users.

---

[6]     Otto fuel is 1,2-propanediol dinitrate.

14

Per- and polyfluoroalkyl substances (PFAS) were not identified as a contaminant of concern (COCs) at the Site because extensive past investigations did not identify use of PFAS at the Site. The Department of Defense (DoD) has identified PFAS as an emerging contaminant of concern at former and current DoD facilities. As the Site was a former Navy facility, and to conclusively rule out PFAS as a contaminant of concern with empirical data, DTSC will require the developer to sample and analyze Site soil and groundwater for PFAS as part of the RAW implementation.

2. *Substance of Comments: "The newly established Water Board Environmental Screening Level (ESL) for VOCs in soil and soil gas are more protective than the proposed cleanup goals"*

DTSC response: The Water Board ESLs are used as a screening tool, typically in the investigation phase, to determine if further Site-specific evaluation of VOCs in soil vapor is warranted. The Site-specific cleanup goals for VOCs and other contaminants in both soil and soil vapor are evaluated and specified in the RAW based on current standards. These cleanup standards are intended to be protective of the intended residential land use.

3. *Substance of Comments: "Groundwater at the Site has not been adequately investigated even though two municipal wells within one mile of the Site have been closed. If the development is allowed to proceed before groundwater has been investigated, it will prevent future soil excavation as part of a future groundwater remedy"*

DTSC response: There was no data indicating groundwater at the Site is contaminated or that the Site is the source of any groundwater contamination. The two municipal wells identified were closed due to mechanical problems, and elevated concentrations of nitrates are a regional

15

issue. Pasadena Water and Power confirmed this information at the Pasadena City Council meeting on May 13, 2019. Groundwater will be investigated as part of the cleanup activities, and if it is determined that further groundwater investigation and/or remediation is necessary, DTSC will pursue the additional remedial work with the parties responsible for the contamination. Proven in-situ remedial technologies can be used to remediate subsurface soils and groundwater, even without physical access to the surface area over a release.

4. *Substance of Comments: "The plan to leave hazardous waste in place after the removal action would endanger children and future residents, causing cancer and birth defects along with learning and other lifelong disabilities. Because there are no quantifiable cleanup goals in the RAW, confirmatory sampling will not be reliable because it will be conducted by a consultant retained by the developer and will therefore be biased. Site cleanup activities would expose the community to risk from contaminants with fugitive dust and VOCs emission"*

DTSC response: Because the cleanup levels in the RAW are for residential and unrestricted use, no hazardous waste levels of contamination will be left in the soil or soil gas. The RAW specified residential cleanup goals for chemicals of concern in soil and soil gas after the cleanup; data from confirmatory sampling of soil and a soil gas survey will be used to complete a human health risk assessment prior to development of the Site. If necessary, the RAW requires a vapor intrusion mitigation system to protect future Site residents. The soil and vapor samples will be analyzed by laboratories that are certified under the California Environmental Laboratory Accreditation Program. Sampling data will not only be carefully evaluated by DTSC, it will also be validated by an independent third-party professional in accordance with the EPA Level 2 validation process.

As part of the RAW implementation activities, fugitive dust, particulates and emission of volatile organic compounds will be controlled with the application of water, dust control foam and plastic covers, as necessary. In addition, air and weather monitoring devices within the Site and along the fence line will measure air quality as required by the South Coast Air Quality Management District (SCAQMD). The air monitoring activities will ensure that RAW implementation activities conform to SCAQMD's requirements for dust, volatile organic compounds emission and particulate emissions. Pasadena Gateway will be required to comply with the relevant permit and notification requirements. DTSC will oversee RAW implementation activities to ensure adherence to the RAW.

5. *Substance of Comments: "Re-open the SCEA because it does not adequately address those issues previously mentioned above. DTSC's statement of findings in compliance with CEQA determined that the Project has significant environmental effects but is approving the Project due to Project benefits that outweigh the significant environmental effects. DTSC has not demonstrated that the Project benefits outweigh the significant environmental effects"*

DTSC response: The SCEA, developed and approved in 2018 by the City, is similar to a mitigated negative declaration because the Project's mitigation measures reduce impacts to a level of insignificance. Since the City is the CEQA lead agency for the whole transit priority project, decisions on the CEQA document rest with the City. The RAW is a part of the City's larger Project, and DTSC is classified as a responsible agency under CEQA. Consequently, DTSC's authority is limited to oversight of the remediation activities detailed in the RAW, and DTSC has no authority to reopen the SCEA. DTSC analyzed the potential environmental impacts associated with the RAW's proposed removal activities, and determined that (a) those proposed activities, including the changes required to address the public

17

comments received in 2019, will not result in a significant adverse impact to the environment, and (b) none of the conditions in Guidelines section 15162 would require reopening of the SCEA.

Although "Otto" fuel was detected in low concentrations at the Site, other chemicals associated with rocket fuel were not found. There was no evidence of weapons testing or manufacture at the Site.

DTSC did not identify PFAs as a contaminant of concern because past investigations had not found they were used at the Site. Nonetheless, DTSC agreed to develop a work plan to identify any explosives (RDX, TNT) at the Site and proposed cleanup if such chemicals were detected "above screening levels."

Under CEQA, on August 5, 2019 DTSC issued a Statement of Findings, which concluded that the proposed Project will not result in a significant impact to the environment. DTSC filed a Notice of Determination on August 6, 2019.

## I.  *SIWP (Supplemental Investigation Work Plan)*

After approval of the RAW, STHIP complained that additional chemicals existed at the Site that had not been evaluated (the explosives TNT and RDX and fire-fighting chemical PFA). STHIP asserted that "virtually all US military sites" used PFAs to control explosives and fuel-based fires.

STHIP complained that certain contaminants of concern (COCs) including TNT, RDX and PFAs do not break down in the environment and travel into the groundwater. STHIP asserted the current excavation did not dig deep enough to assure the PFAs would be removed from the soil. The current studies did not evaluate the groundwater or sufficiently test for these

chemicals.  STHIP continued to assert that weapons were manufactured or tested at the Site.

As a result of STHIP's concern, on September 19, 2019, Ninyo and Moore, the preparers of the RAW, submitted the SIWP.  The SIWP was designed to study the Site for TNT, RDX and PFAs.  The SIWP identified small concentrations of Otto fuel (which it indicated was not used as a propellant for torpedoes).  The SIWP explained that if explosive compounds, such as RDX or TNT, were stored on Site, the most likely location would be in the small storage shed previously located south of Building 5 as shown on a 2007 Site evaluation.  If RDX or TNT were released on Site, the release would have most likely collected in the storm drain catch basins near Buildings 3 and 5, and then ultimately discharge into the seepage pits on Site.  Therefore, the proposed sampling for the potential presence of residual explosive compounds, such as RDX and TNT, and PFAS would be conducted from all accessible seepage pits and select storm-drain inlets in the vicinity of Buildings 3, 5, 18, and 131.  Testing would be conducted for PFAs.

DTSC approved the SIWP on September 24, 2019.


## II.   *PROCEDURAL HISTORY*

A.   *Petition for Writ of Mandate*

On November 15, 2019, STHIP  filed a petition for writ of mandate, stating one claim under CEQA and two claims under HSAA.[7]  STHIP argued that DTSC violated CEQA by approving the Project despite significant changes to the 2017 RAW which identified new information regarding

---

[7]    A copy of the petition is not part of the record, although the memorandum of points and authorities in support of the writ petition is included in the appendix.

19

explosives (RDX and TNT) and PFAs.  STIP argued that the RAW failed to comply with the HSAA because it did not adequately characterize the contamination at the Site and did not mitigate all contaminants of concern.

B. *Trial Court Ruling*

The trial court issued its statement of decision on August 21, 2020.

1. *Challenges Under CEQA*

(a) *Accurate and Stable Project Description*

The court rejected STHIP's argument that DTSC failed to provide an accurate and stable project description because the RAW initially did not include explosives (RDX, TNT) or PFAs.  The trial court observed that "[t]he 'CEQA reporting process is not designed to freeze the ultimate proposal in the precise mold of the initial project; indeed, new and unforeseen insights may emerge during investigation, evoking revision of the original proposal.'"  (See *East Sacramento Partnerships for a Livable City v. City of Sacramento* (2016) 5 Cal.App.5th 281, 290; see also *Citizens for a Sustainable Treasure Island v. City and County of San Francisco* (2014) 227 Cal.App.4th 1036, 1053 [projects descriptions have built-in flexibility to respond to changing conditions and unforeseen events].)  Where, as here, the modification arose from "new and unforeseen insights" and is in alignment with purposes of the RAW (to identify and remove hazardous substances from the Site), it is plainly permissible.  Indeed, a contrary conclusion would undermine the change-in-response-to-comment process that is a basic function of CEQA.

(b) *Adequacy of Findings Under CEQA*

The court rejected STHIP 's contention the RAW failed as an informational document because it did not adequately describe the impact of RDX, TNT and PFAs at the Site or the remedial measures DTSC proposed.

After observing that it was the function of the SCEA, not the RAW, to identify all environmental impacts and contain measures to mitigate such impacts to a level of insignificance (§ 21155.2, subd. (b)(1)), the court concluded that DTSC had provided sufficient information concerning contaminants at the Site. DTSC repeatedly noted that there was no direct evidence that these contaminants are present at the Project Site even though "multiple environmental studies" had been performed at the Project Site. Further, DTSC noted that such contaminants were unlikely present because of "the location of the facility, in the middle of heavily populated Pasadena, its small size and infrastructure (wooden buildings), and the lack of any consequential energetic material detected in soil."

(c) *Subsequent or Supplemental Environmental Review*

The court rejected STHIP's contention that the identification of the three new hazardous substances warranted subsequent or supplemental environmental review. The court did not find substantial changes in the Project under Guidelines section 15162, subdivision (a). First, the mitigation measures were materially the same as the previously adopted mitigation measures, and second the RAW already included comprehensive mitigation measures. Finally, the court rejected STHIP 's argument that there was evidence in the record that explosives were present at the Site, pointing out that the court was entitled to rely on the contrary evidence in the administrative record.

21

## 2. *Challenges Under HSAA*

STHIP asserted the RI/FS did not comply with HSAA in numerous respects.[8]

### (a) *Characterization of the Contamination*

#### i. *Site Access and Sampling*

The court observed that the NCP provides that agencies like DTSC have the authority to enter any facility, establishment, or other place "and conduct, complete, operate, and maintain any response actions authorized by CERCLA or these regulations" for purposes of "determining the need for response, or choosing or taking a response action." (40 C.F.R. § 300.400, subd. (d).) Further, the NCP states that lead agencies must "[d]evelop sampling and analysis plans that shall provide a process for obtaining data of sufficient quality and quantity to satisfy data needs." (40 C.F.R. § 300.430, subd. (b)(8).)

STHIP contended that DTSC violated NCP requirements for full Site access by allowing Pasadena Gateway to impose access restrictions on the RAW's Site characterization. STHIP also claimed that although buildings cover the majority of the Site, most of the buildings had no soil samples and the soil samples were not taken at sufficient depth or near the water tables.

However, the court found the evidence established Pasadena Gateway granted DTSC access to the Site and has collected samples across the Site to aid DTSC in determining an appropriate response action.

The court held the EPA Guidance makes clear that sampling methods involve the use of discretion because sampling must be suited to the site

---

[8] The trial court concluded STHIP had failed to exhaust its administrative remedies because it failed to raise its challenges during the comment period. Nonetheless, the court addressed STHIP's arguments on the merits.

22

being analyzed.  Here, samples were collected from storage sheds, laboratory floor drains, vehicle maintenance area, sewer system, storm drains, and seepage pits.  Among other things, sub-slab sampling focused on several buildings of industrial use with higher environmental concerns, and deep soil boring sampling focused on locations believed to possess the highest potential for soil contaminant migration affecting groundwater.  Given DTSC's extensive sampling across the Project Site  and the discretion with which DTSC is vested to make sampling decisions, DTSC's sampling decisions were supported by substantial evidence.

*ii.  Identification of All Contaminants at the Project Site*

As part of the RI process, the NCP at 40 C.F.R. section 300.430, subdivision (d)(2) requires lead agencies to "characterize the nature of and threat posed by the hazardous substances and hazardous materials [at the project site] and gather data necessary to assess the extent to which the release poses a threat to human health or the environment or to support the analysis and design of potential response actions by conducting, as appropriate, field investigations to assess the following factors  [¶]  . . .  [¶] (iii)  The general characteristics of the waste, including quantities, state, concentration, toxicity, propensity to bioaccumulate, persistence, and mobility."  (40 C.F.R. § 300.430, subd. (d)(2)(iii).)

Petitioner contended that the RI/FS did not comply with this NCP requirement by failing to identify RDX, TNT and other explosives associated with weapon research and development.  The court rejected this argument for the same reason it rejected STHIP's CEQA claims.

23

*iii.  Cleanup Standards for the Additional Contaminants*

The court observed that according to the NCP, during the RI process, "[t]he lead and support agency shall identify their respective potential ARARs related to the location of and contaminants at the site in a timely manner." (40 C.F.R. § 300.430, subd. (d)(3).)  ARARs are "the benchmark by which the effectiveness of a remedial action selected by [agencies] to clean up hazardous substance contamination is measured." (*United States v. Iron Mountain Mines, Inc.* (1997) 987 F.Supp. 1263, 1267, fn. 5.)

STHIP contended that the RI/FS and the RAW were deficient because they fail to identify ARARs for RDX, TNT, and PFAs.  DTSC did not identify these additional contaminants at the Project Site until after preparation of the RI/FS and draft RAW because there was no evidence that the contaminants existed at the Project Site.  Accordingly, DTSC had no obligation to identify ARARs for these contaminants.

*iv.  Identification of Sources of VOCs*

STHIP contended that the RAW and underlying RI/FS did not comply with the NCP because they failed to identify the sources of VOC soil gas.  The NCP states that, during the RI process, the lead agency shall conduct field investigations to assess "[t]he extent to which the source [of contamination] can be adequately identified and characterized." (40 C.F.R. § 300.430, subd. (d)(2)(iv).)

The court held substantial evidence supports DTSC's VOC source identification efforts.  The RI/FS tested for VOCs at several locations at the Project Site  and detected VOC in soil gas "throughout the Site in all areas and at depths of approximately 5 feet [below ground] to 150 feet [below ground]" although the VOCs were "more focused in the southern and eastern

24

portions." The RI/FS concluded that "[t]he most likely source of the VOCs is the former military operations on the Site." Based on these results, DTSC has decided to require removal of the storm drain system and seepage pits located in the southern and eastern portions of the Project Site, and DTSC will require confirmation sampling after removals of soils.

### v. Testing for Offsite Contaminant Migration

The RI/FS EPA Guidance states that field investigations should "us[e] the information on source location and physical site data (e.g., ground-water flow directions, over land flow patterns) to give a preliminary estimate of the locations of contaminants that may have migrated." Further, DTSC guidance on vapor intrusion notes that, in determining the extent and pathways of contaminants, "uses of adjacent properties should be determined in order to evaluate potential exposure associated with offsite migration of subsurface contamination."

STHIP claimed that the RI/FS did not comply with NCP requirements for off-site testing of contaminant migration. However, the trial court found that NCP does not contain a sweeping requirement that agencies perform off-site testing, and even the DTSC guidance document cited by STHIP merely states that "uses of adjacent properties" should be considered in evaluating potential exposure. The court concluded the only issue raised by STHIP's argument was whether substantial evidence supports DTSC's decision not to perform off-site testing for contaminant migration in light of the NCP's mandate that agencies assess "the general characteristics of the waste, including [its] mobility." (40 C.F.R. § 300.340, subd. (d)(2)(iii).)

The court found that substantial evidence supported DTSC's decision for two reasons. First, DTSC analyzed contaminant exposure pathways to

25

determine how those pathways might affect human health. The RI/FS concludes that "site development will essentially eliminate the soil exposure pathway because the site will be entirely built-up with structures . . . and paved roadways" and the RAW addresses any lingering soil exposure pathways to construction workers via a soil management plan.

Second, the RAW required that cleanup of contaminants meet standards for residential, unrestricted use. Once these standards are met, "no hazardous waste levels of contamination [should] be left in the soil or soil gas." The court found "[t]hese requirements make clear that DTSC is not abdicating its cleanup responsibilities and is ensuring that any contamination migration flowing from the [Site] is stopped."

### vi. Groundwater Testing

The RI/FS EPA Guidance notes that the nature and extent of groundwater contamination should be evaluated both horizontally and vertically, and it should be determined if contamination of an aquifer is present and if such contamination could potentially affect human or environmental receptors.

STHIP contends that the RI/FS does not meet NCP requirements for groundwater characterization by failing to require groundwater tests until *after* Site construction. The court concluded this argument failed for similar reasons cited above about soil testing. While groundwater testing at the Site was an essential step in ensuring an adequate cleanup, this does not necessitate the finding that groundwater testing must occur immediately.

26

(b) *Challenges to RAW*

STHIP challenged the adequacy of the RAW's remediation strategy, which involved soil excavation, off-site disposal of the soil, soil gas surveys, and vapor intrusion mitigation, if necessary. STHIP pointed to the RAW, which explained that soil excavation will occur at 13 locations to address PAHs, TPHs, and VOCs, in storm drains, seepage pits, and other associated hot spots; confirmation samples would be collected from excavation pits, and if the soil meets cleanup goals, the excavations will be backfilled and graded smooth. If cleanup goals are not attained, excavation will continue to the depth the equipment will allow. Finally, if confirmation samples still exceed permissible levels, a slurry cap will be placed at the depth of excavation terminus.

STHIP contended that this remediation option was inadequate because it does not accord with relevant EPA Guidance. The court disagreed. The EPA's "preferred long-term response" is what the RAW strives to accomplish by requiring multiple rounds of excavation of the Site's hotspots. Vapor mitigation systems would be installed only in the event that these multiple excavation efforts fail to adequately remove the contaminants. The EPA Guidance does not preclude the use of such mitigation where elimination of the contaminants is deemed impracticable, and STHIP failed to show that installation of such systems would not address lingering vapor intrusion risks.

## DISCUSSION

### I. CEQA

STHIP argues that the addition of the SIWP represented a vastly enlarged Project compared to what originally appeared in the RAW, and the

Project failed to give sufficient information regarding the new COCs. (See *Santiago County Water Dist. v. County of Orange* (1981) 118 Cal.App.3d 818 (*Santiago.*) Further, STHIP disputes the trial court's finding that the new COCs were not integral to the RAW and argues that new COCs will dictate new remedies. Finally, it argues that the trial court improperly imposed a wrongful intent requirement under *County of Inyo v. City of Los Angeles* (1977) 71 Cal.App.3d 185, 193 (*County of Inyo*) to find that DTSC did not improperly exclude information regarding the new COCs. As a result, STHIP contends the RAW fails as an information document under CEQA. We disagree.

### A. *Standard of Review*

We review STHIP's CEQA challenge to the SCEA under the administrative writ statute, Code of Civil Procedure section 1094.5. (§ 21168.) Our review in a CEQA case, as in other mandamus actions, is the same as that of the trial court. (*In re Bay-Delta etc.* (2008) 43 Cal.4th 1143, 1162.) We review the agency's action, not the trial court's decision, and our inquiry extends only to whether there has been a prejudicial abuse of discretion on the part of the agency. (*Id.* at pp. 1161–1162.) An agency abuses its discretion under CEQA either by failing to proceed in the manner CEQA requires or by reaching factual conclusions unsupported by substantial evidence. (*Banning Ranch Conservancy v. City of Newport Beach* (2017) 2 Cal.5th 918, 935; Code Civ. Proc., § 1094.5, subd. (b).) We review the City's decision to analyze and approve a transit priority project through an SCEA under the substantial evidence standard. (§ 21155.2, subd. (b)(7).) We do not exercise our independent judgment on the evidence but only determine

28

whether the agency's decision is supported by substantial evidence considering the whole record.  (§ 21168.)

Under CEQA, judicial review of procedural error and factual error differs significantly.  While we determine de novo whether the agency has employed the correct procedures, we accord greater deference to the agency's substantive factual conclusions.  (*Sacramentans for Fair Planning, supra,* 37 Cal.App.5th at p. 722.)  We presume the City's findings and actions are supported by substantial evidence, and STHIP bears the burden of showing the City's findings are not supported by substantial evidence.  (*Ibid*.)

We do not pass upon the correctness of the SCEA's environmental conclusions, but only upon its sufficiency as an informative document.  (*In re Bay-Delta etc.*, *supra,* 43 Cal.App.4th at p. 1161.)  Generally, that inquiry is a mixed question of law and fact subject to de novo review, "but to the extent factual questions predominate, a more deferential standard" of review applies.  (*Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 516 (*County of Fresno*).)

Finally, substantial evidence is reasonable, credible, and of solid value.  A finding is not supported by substantial evidence if there is no reasonable basis for it in the record.  (*Department of Water Resources Environmental Impact Cases* (2022) 79 Cal.App.5th 556, 573.)  We accept the trial court's resolution of credibility and conflicting substantial evidence, and its choice of possible reasonable inferences that can be drawn from the evidence.  (*Ibid*.)  In doing so, we resolve all conflicts in favor of the trial court's findings.  We do not determine whether substantial evidence would have supported a contrary judgment, but only whether substantial evidence supports the judgment actually entered by the trial court.  (*Yazdi v. Dental Bd. of California* (2020) 57 Cal.App.5th 25, 32.)

B.    *The SCEA*

As we recently explained, CEQA advances four related purposes: (1) informing the government and public about a proposed project's potential environmental impacts; (2) identifying ways to reduce or avoid environmental damage; (3) preventing environmental damage by requiring project changes via alternatives or mitigation measures when feasible; and (4) disclosing to the public the rationale for governmental approval of a project that may significantly impact the environment. (*Southwest Regional Council of Carpenters v. City of Los Angeles* (2022) 76 Cal.App.5th 1154, 1171 (*Southwest Carpenters*).)

As noted above, because the Project was governed by the Sustainable Communities Act, that Act limited the extent of environmental review that the local agency must perform under CEQA. If a transit priority project (1) "is consistent with the general use designation, density, building intensity, and applicable policies specified for the project area" in the strategy; and (2) incorporates all feasible mitigation measures, performance standards, and criteria set forth "in the prior applicable environmental impact reports" and which were adopted as findings, then the local agency may review the project's environmental effects in a streamlined manner using an SCEA. (§§ 21155, subd. (a), 21155.2, subds. (a), (b); see *Sacramentans for Fair Planning, supra,* 37 Cal.App.5th at p. 706.)

Review is streamlined because an SCEA is not required to analyze certain types of environmental impacts. It need not discuss growth inducing impacts or any project-specific or cumulative impacts on global warming or the regional transportation network that may arise from automobile and light-duty truck trips generated by the project. (§ 21159.28, subd. (a).) Also, where the lead agency determines that a cumulative effect has been

30

adequately addressed and mitigated in prior applicable certified environmental impact reports, that cumulative effect shall not be treated as cumulatively considerable and subject to further environmental review. (§ 21155.2, subd. (b)(1).)  In addition, the SCEA is not required to analyze offsite alternatives, nor is it required to reference, describe, or discuss a reduced residential density alternative to address the effects of car and light-duty truck trips generated by the project.  (§§ 21155.2, subd. (c)(2); 21159.28, subd. (b).)

Under the Sustainable Communities Act, the SCEA functions like an EIR in many respects.  Like an EIR, an SCEA is considered "an informational document" designed to "provide public agencies and the public in general with detailed information about the effect [of] a proposed project . . . on the environment." (§ 21061.)  The SCEA provides methods by "which the significant effects of such a project might be minimized" and proposes alternatives to the project.  (*Ibid*.)  "The EIR must set forth not only environmental impacts and mitigation measures to be reviewed and considered by state and local agencies, but also project alternatives [citations]—including a 'no project' alternative.  [Citation.]  . . . '[T]he mitigation and alternatives discussion forms the core of the EIR.'  [Citation.]" (*Friends of the Eel River v. North Coast Railroad Authority* (2017) 3 Cal.5th 677, 713.)

The failure to comply with CEQA's informational requirements does not require reversal unless there is prejudice.  (§ 21005, subd. (b).)  Such prejudice is found, however, if the failure to include relevant information precludes informed decision-making and informed public comment.  (*Washoe Meadows Community v. Department of Parks & Recreation* (2017) 17 Cal.App.5th 277, 290 (*Washoe Meadows*).)  The omission of relevant

31

information is deemed prejudicial "'regardless of whether a different outcome would have resulted if the public agency had complied with those provisions.' [Citations.]" (*Ibid.*, citing § 21005, subd. (a).)

Relevant to the SCEA here, the primary purpose "of an EIR is to give the public and government agencies the information needed to make informed decisions, thus protecting "'not only the environment but also informed self-government.'" [Citation.]" (*In re Bay-Delta, supra*, 43 Cal.4th at p. 1162.) "The ultimate inquiry, as case law and the CEQA guidelines make clear, is whether the EIR includes enough detail 'to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project.' [Citations.]" (*County of Fresno, supra*, 6 Cal.5th at p. 516.) The sufficiency of an EIR is to be evaluated in light of what is reasonably feasible. (*California Oak Foundation v. Regents of University of California* (2010) 188 Cal.App.4th 227, 262.) "The overriding issue on review is thus 'whether the [lead agency] reasonably and in good faith discussed [a project] in detail sufficient [to enable] the public [to] discern from the EIR the "analytic route the . . . agency traveled from evidence to action." [Citation.]' [Citation.]" (*Ibid.*)

C.    *Changes To The RAW Did Not Violate CEQA's Stable Project Requirement*

A draft EIR must contain a project description. (*South of Market Community Action Network v. City and County of San Francisco* (2019) 33 Cal.App.5th 321, 332 (*SoMa*).) An accurate project description is the "sine qua non" of an informative and legally sufficient EIR. (*Ibid.*) According to the Guidelines, the project description must include (a) the precise location and boundaries of the proposed project, (b) a statement of the objectives

sought by the proposed project, (c) a general description of the project's technical, economic and environmental characteristics, and (d) a statement briefly describing the intended use of the EIR. (Guidelines, § 15124, subds. (a)–(d).)

In addition, the project description must be "accurate, stable and finite[.]" (*County of Inyo, supra,* 71 Cal.App.3d at p. 193.) "A project description that gives conflicting signals to decision makers and the public about the nature of the project is fundamentally inadequate and misleading. [Citation.]" (*SoMa, supra,* 33 Cal.App.5th at p. 332.) Whether the EIR adequately describes the project is reviewed de novo. (*Washoe Meadows, supra,* 17 Cal.App.5th at p. 287.)

### 1. *The Identification of the New COCs Did Not Constitute a Substantial Change in the Project Description*

We conclude that the addition of several COCs that identified toxic substances that might be on the Site did not constitute a substantial change to the Project description. In *Southwest Regional Carpenters, supra,* 76 Cal.App.5th 1154, we held that modifications to the retail/commercial configuration of a mixed-use project after comments had closed did not render the project description unstable. We observed that "[t]he project, from inception through approval, was a mixed-use commercial/residential project on a defined projects site. The only changes involved the composition and ratio of the residential to commercial footprint, but the . . . overall size of the project remained consistent, and the site remained the same." (*Id.* at p. 1179.)

Even assuming the evidence supports a finding that the COCs were present at the Site, *Southwest Regional Carpenters* governs our analysis.

33

Here, the Site was contaminated with a number and variety of toxic chemicals, and the focus of the testing and feasibility studies was to analyze whether the Site could be remediated with respect to these chemicals. Thus, at all times (even after the SIWP), the focus was on removal and identification of contaminants. Whether additional, unknown chemicals were present at the time of the approval of the SCEA would not change the necessity of remediation. Further, monitoring was built into the process so that even if unforeseen COCs were discovered at the Site, they could be dealt with.

In that regard, *Santiago* is readily distinguishable. In *Santiago*, a water district challenged an EIR for a mining operation in its district. (*Santiago, supra*, 118 Cal.App.3d at p. 822.) *Santiago* concluded that the EIR provided inadequate information about water supply in two respects. (*Santiago*, *supra,* at p. 829.) First, the EIR did not provide information about the facilities that would be needed to deliver water to the mining operation "or facts from which to evaluate the pros and cons of supplying the amount of water that the mine will need." (*Ibid.*) Instead of analyzing the impact that supplying water to the mining operation would create, the EIR simply stated, incorrectly, that the district had indicated its ability to supply the water. (*Santiago, supra,* at pp. 830–831.) Second, the EIR was "silent about the effect of that delivery on water service elsewhere in the Water District's jurisdiction." (*Santiago, supra,* at p. 831.) *Santiago* held that the EIR lacked "information about how adverse the adverse impact will be." (*Ibid.*)

Here, extensive and detailed environmental analysis took place at the Site, with numerous contaminants identified. The entire Site had been mapped for contaminants, and an analysis of the effect of the removal process and subsequent development had been undertaken. The remediation process

34

has monitoring built in with repeated testing as contaminants are removed. Any "new" COCs identified would necessarily be addressed as planning and execution of remediation takes place. Thus, their presence on the Site does not render the Project description unstable.

2.    *There Was Sufficient Opportunity to Comment on the RAW*

STHIP contends the RAW fails to comply with Guidelines section 15201 because there was no opportunity for meaningful review and the RAW was approved without any public comment.

"Public participation is an essential part of the CEQA process." (Guidelines, § 15201.) Several CEQA provisions recognize its importance. For example, an agency must provide public notice that it is preparing an EIR or a negative declaration (§ 21064) before approving a project, although individuals need not be given notice unless they have previously requested it. (§ 21092.) In addition, the Guidelines provide for a period of public review for a draft EIR or for a negative declaration. (Guidelines, §§ 15073, 15087.)

As one commentator has noted, "the 'privileged position' that members of the public hold in the CEQA process . . . is based on a belief that citizens can make important contributions to environmental protection and on notions of democratic decision-making." (Selmi, *The Judicial Development of the California Environmental Quality Act* (1984) 18 U.C.Davis L.Rev. 197, 215–216.) "CEQA compels an interactive process of assessment of environmental impacts and responsive project modification which must be genuine. It must be open to the public, premised upon a full and meaningful disclosure of the scope, purposes, and effect of a consistently described project, with flexibility to respond to unforeseen insights that emerge from the process." (*County of Inyo v. City of Los Angeles* (1984) 160 Cal.App.3d

1178, 1185.) A project must be open for public discussion and subject to agency modification during the CEQA process. This process helps demonstrate to the public that the agency has in fact analyzed and considered the environmental implications of its action. (*Concerned Citizens of Costa Mesa, Inc. v. 32nd Dist. Agricultural Assn.* (1986) 42 Cal.3d 929, 935–936.)

Here, there was sufficient opportunity for public comment. The public was aware, through the RI/FS and the RAW, that the Site had a long history of contamination resulting from military use. Testing at the Site disclosed numerous contaminants in the soil and soil gas and ruled out other contaminants based on this historical use. Testing results were disclosed in the RI/FS and the RAW and the public comment period on DTSC's findings was sufficiently lengthy to permit adequate input. That, after the close of the comment period, STHIP raised the issue of contaminants not found at the Site does not render the comment period inadequate. Furthermore, STHIP cannot demonstrate any prejudice from the introduction of the SIWP to the analysis after the comment period closed.

3. *Substantial Evidence Supports the Trial Court's Conclusion the COCs Were New and Unforeseen, and Recirculation Was Not Required*

STHIP contends the identification of the new COCs constituted a substantial change in the Project, requiring the preparation of a new SCEA. It also contends that the trial court erred in finding that the new COCs were "unforeseen." We disagree.

"If the lead agency adds 'significant new information' to the EIR subsequent to the close of the public comment period but prior to certification of the final EIR, CEQA requires that the lead agency provide a new public

comment period.  (§ 21092.1.)"  (Guidelines, § 15088.5, subd. (a); *Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1124–1125, italics omitted; *Mount Shasta Bioregional Ecology Center v. County of Siskiyou* (2012) 210 Cal.App.4th 184, 217.)  Recirculation means making the revised EIR available for public review and consulting with the other agencies again before certifying the EIR.  (Guidelines, § 15088.5, subd. (d).)  "New information added to an EIR is not 'significant' unless the EIR is changed in a way that deprives the public of a meaningful opportunity to comment upon a substantial adverse environmental effect of the project or a feasible way to mitigate or avoid such an effect (including a feasible project alternative) that the project's proponents have declined to implement."  (*Id.*, subd. (a).)

"'Significant new information' requiring recirculation includes, for example, a disclosure showing that:  [¶]  (1)  A new significant environmental impact would result from the project or from a new mitigation measure proposed to be implemented[;]  [¶]  (2)  A substantial increase in the severity of an environmental impact would result unless mitigation measures are adopted that reduce the impact to a level of insignificance[;]  [¶]  (3)  A feasible project alternative or mitigation measure considerably different from others previously analyzed would clearly lessen the significant environmental impacts of the project, but the project's proponents decline to adopt it[;]  [¶] (4)  The draft EIR was so fundamentally and basically inadequate and conclusory in nature that meaningful public review and comment were precluded."  (Guidelines, § 15088.5, subd. (a).)

Recirculation is thus not required simply because new information is added.  The final EIR will almost always contain information not included in the draft EIR given the CEQA statutory requirements of circulation of the

37

draft EIR, public comment, and response to these comments prior to certification of the final EIR. Recirculation was intended to be an exception, not the general rule. (*South County Citizens for Smart Growth v. County of Nevada* (2013) 221 Cal.App.4th 316, 328.)

Here, as discussed above, the addition of the SIWP detailing the actions to be taken if the new COCs were in fact found at the Site is not sufficiently "new" to require recirculation for additional comment. Throughout the process, the basic focus of the RAW was contaminants and their cleanup. The addition of new COCs did not require additional comment. Indeed, STHIP fails to demonstrate how their presence undermined any remedial action that would be undertaken.

## II.     VIOLATION OF HSAA

### A.     *Legal Principles*

The Carpenter–Presley–Tanner Hazardous Substance Account Act (HSAA), Health and Safety Code section 25300, et seq., is California's version of CERCLA (42 U.S.C. § 9601 et seq.) (*Foster–Gardner, Inc. v. National Union Fire Ins. Co.* (1998) 18 Cal.4th 857, 865, fn. 4.) The HSAA utilizes CERCLA definitions except where the HSAA defines terms differently or "the context requires otherwise." (§ 25310; *Otay Land Co., LLC v. U.E. Limited, L.P., supra,* 15 Cal.App.5th at p. 822.)

As California's counterpart to CERCLA, HSAA provides a comprehensive scheme to ensure the timely and cost-effective cleanup of hazardous substance release sites. (See *City of Lodi v. Randtron* (2004) 118 Cal.App.4th 337, 352 (*City of Lodi*).) The stated purposes of HSAA are threefold: (1) to provide for response authority for releases of hazardous substances that pose a threat to the public health or environment, (2) to

38

provide compensation for out-of-pocket medical expenses and lost wages or business income resulting from injuries caused by exposure to hazardous substances, and (3) to make available adequate funding to meet federal requirements that California pay 10 percent of the cleanup costs. (Health & Safety Code, § 25301; *City of Lodi, supra,* 118 Cal.App.4th at p. 352.)

The focus of HSAA's statutory scheme is the DTSC, which has "the sole authority to administer the statewide program for the remediation of hazardous waste contamination" at sites identified for remediation under the HSAA. (*City of Lodi, supra*, 118 Cal.App.4th at p. 355.) "Once DTSC has confirmed that contamination at a particular site poses a significant threat to human health or safety or to the environment and lists the site in its published list of hazardous substance release sites, the problem is designated as one of statewide concern, requiring application of uniform standards, procedures, and remedies subject to the jurisdiction of DTSC." (*Ibid.*) In appropriate cases, the relevant RWQCB may also have authority over a specific site. (Health & Safety Code, §§ 25356, subd. (h), 25356.1, subds. (a), (b), (c).)

To implement this scheme, HSAA "establishes authority, procedures, and standards to carry out the investigation, removal and remediation of contaminated sites." (*Orange County Water Dist. v. Alcoa Global Fasteners, Inc.* (2017) 12 Cal.App.5th 252, 299 (*Orange County Water Dist.*); *City of Lodi, supra,* 118 Cal.App.4th at p. 352.) Any response actions taken must "be based upon, and no less stringent than, . . . [t]he requirements . . . of the National Oil and Hazardous Substances Pollution Contingency Plan [NCP]."

(Health & Safety Code, § 25356.1.5, subd. (a)(1).)[9]  The NCP is a body of regulations governing the clean up of hazardous waste sites under CERCLA. (See 42 U.S.C. § 9605(a); 40 C.F.R. Part 300; *Redwing Carriers, Inc. v. Saraland Apartments* (1996) 94 F.3d 1489, 1496, fn. 8.)  Under section 25356.1.5, HSAA adopts the NCP and defines terms as they are defined in CERCLA.  Indeed, "HSAA incorporates the NCP standard by reference." (*Fireman's Fund Ins. Co. v. City of Lodi, California* (9th Cir. 2002) 302 F.3d 928, 949.)  Finally, the HSAA requires that "[a]ny health or ecological risk assessment prepared in conjunction with a response action taken or approved pursuant to this chapter shall be based upon [the NCP] (40 C.F.R. 300.400 et seq.)"  (§ 25356.1.5, subd. (b).)

A response action is NCP compliant if the action is, among other things, "in substantial compliance with the applicable requirements."  (40 C.F.R. § 300.700(c)(3)(i).)


B.    *Relevant Principles of HSAA*

STHIP argues that DTSC failed to comply with HSAA in numerous respects because the RI/FS did not comply with NCP and failed to include sufficient testing and remediation at the Site.  STHIP's arguments focus on 40 C.F.R. section 300.430, governing remedial investigations/feasibility studies.

Section 25356.1.5, subdivision (a)(1) obligates DTSC to follow the NCP. The NCP states that the purpose of a remedial investigation is "to collect data necessary to adequately characterize the site for the purpose of

---

[9]    The purpose of the NCP is to provide the organizational structure and procedures for preparing for and responding to discharges of oil and releases of hazardous substances, pollutants, and contaminants.  (40 C.F.R. § 300.100.)

developing and evaluating effective remedial alternatives." (40 C.F.R. § 300.430, subd. (d)(1).) DTSC must assess "[t]he extent to which the source [of the contaminants] can be adequately identified and characterized." (40 C.F.R. § 300.430, subd. (d)(2)(iv).) However, a RI/FS is a dynamic, flexible process tailored to the specific circumstances of individual sites. (40 C.F.R. § 300.430, subd. (a)(2).) EPA Guidance sets forth instructions for conducting a RI/FS under CERCLA. The project must determine "how best to use the flexibility built into the process to conduct an efficient and effective RI/FS that achieves high-quality result in a timely and cost-effective manner." Along those lines, the objective of the RI/FS process is "not the unobtainable goal of removing uncertainty, but rather to gather information sufficient to support an informed risk management decision regarding which remedy appears to be most appropriate for a given site."

As discussed above, DTSC must conduct a remedial investigation (RI) and feasibility study (FS) before choosing a response action. The end goal of the RI/FS process is "to assess site conditions and evaluate alternatives to the extent necessary to select a remedy." (40 C.F.R. § 300.430(a)(2).) "The national goal of the remedy selection process is to select remedies that are protective of human health and the environment, that maintain protection over time, and that minimize untreated waste." (40 C.F.R. § 300.430(a)(1)(i); *Emhart Industries, supra,* 274 F.Supp.3d at pp. 39–40.)

We review the trial court's factual findings for substantial evidence. (*Orange County Water Dist., supra,* 12 Cal.App.5th at p. 304.)

C.     *DTSC Complied with Relevant Provisions of the NCP*

STHIP asserts that the RAW did not properly characterize the Site; did not identify or test for the new COCs; did not locate all sources of VOC

41

contamination; did not provide adequate remediation of VOCs; did not test for offsite contamination; and did not adequately address groundwater contamination. (See 40 C.F.R. § 300.430.) We disagree.

1. *The RAW Correctly Characterizes the Site*

STHIP contends the RAW incorrectly characterizes the Site because DTSC only conducted a limited investigation into the Site and the RAW defers much of the remedial work. STHIP alleges DTSC only conducted a cursory and limited investigation and instead deferred much of the Site characterization work to a later date, violating NCP's requirements that the Site be fully characterized before finalization of the RAW

C.F.R. section 300.430, subdivision (d)(2) provides: "(2) The lead agency shall characterize the nature of and threat posed by the hazardous substances and hazardous materials and gather data necessary to assess the extent to which the release poses a threat to human health or the environment or to support the analysis and design of potential response actions by conducting, as appropriate, field investigations to assess the following factors: [¶] (i) Physical characteristics of the site, including important surface features, soils, geology, hydrogeology, meteorology, and ecology; [¶] (ii) Characteristics or classifications of air, surface water, and ground water; [¶] (iii) The general characteristics of the waste, including quantities, state, concentration, toxicity, propensity to bioaccumulate, persistence, and mobility; [¶] (iv) The extent to which the source can be adequately identified and characterized; [¶] (v) Actual and potential exposure pathways through environmental media; [¶] (vi) Actual and potential exposure routes, for example, inhalation and ingestion; and [¶] (vii) Other factors, such as sensitive populations, that pertain to the

characterization of the site or support the analysis of potential remedial action alternatives."

We find the Site characterizations in both the RI/FS and the RAW to be compliant with the NCP's requirements.

Sampling at the Site was conducted with its historical uses in mind, and focused on those areas most likely to be contaminated. The RI/FS analyzed the results of the previous 22 investigations, 15 of which had been overseen by DTSC, and which included 382 soil samples and 157 soil gas samples. These samplings yielded the information that heavy metals and VOCs existed in the soil and soil vapor above acceptable residential levels. Sub-slab sampling focused on buildings with a history of industrial use. Finally, the stormwater system contained high levels of contamination and could have migrated to the seepage pits on the Site. (See 40 C.F.R. § 300.430, subd. (d)(2).)

Given the flexibility accorded DTSC in conducting testing and evaluation, STHIP has not shown that insufficient evidence supports the trial court's conclusion this extensive testing complied with the NCP.

2. *The RAW RI/FS Located Sufficient Sources of VOCs as Required by the NCP*

STHIP complains that DTSC experts warned that not all VOC sources had been located and deeper VOC left onsite would be a threat to groundwater. STHIP notes that no testing was done underneath existing structures, that only three locations were tested at deeper than 30 feet, and the testing did not identify where VOC gas was concentrated.

The NCP requires the lead agency to conduct field investigations to assess "the extent to which" the source of contamination can be adequately

43

identified and characterized. (40 C.F.R. § 300.430, subd. (d)(2).) EPA Guidance suggests that "[i]n general, the RI/FS must obtain data to define source areas of contamination, the potential pathways of migration, and the potential receptors and associated exposure pathways to the extent necessary to (1) determine whether, or to what extent, threats exist to human health or the environment, (2) develop and evaluate remedial alternatives (including the no-action alternative), and (3) support future enforcement or cost-recovery activities.

Substantial evidence supports DTSC's VOC source identification efforts. The RI/FS tested for VOCs at several locations at the Project Site. The RI/FS found VOC in soil gas throughout the Site, but noted that it was concentrated on the southern and eastern portions of the Site. Finding that the most likely source of VOCs was the former military operations at the Site, DTSC decided to require removal of the storm drain system and seepage pits located in the southern and eastern portions of the Site. DTSC also recommended confirmation sampling after removals of soil, and planned a future soil gas survey after removal of asphalt. Prior to grading, DTSC would assess current soil gas levels and evaluate if vapor intrusion remains a concern for future residential/commercial Site users. A second soil gas survey may be conducted.

Should the vapor survey(s) indicate the presence of an elevated vapor intrusion risk, the risk (AOC4) will be mitigated through installation of [vapor mitigation systems] beneath slab-on-grade buildings."

Other than complaining that *all* VOCs must be identified (a result clearly not contemplated by the NCP or the EPA Guidance), and asserting that the necessity for future testing renders DTSC's efforts in violation of the NCP, STHIP has failed to show that these sampling efforts to identify the

44

source the VOCs and corresponding measures to remediate the VOCs across the Project Site are insufficient to comply with the NCP. As noted, Site sampling is an ongoing process and this fact alone does not mandate a finding that DTSC violated the NCP.

### 3. *The RI/FS Met NCP Requirements for Testing Offsite Contamination*

The NCP at 40 C.F.R. section 300.430, subdivision (d)(4) states that "[u]sing the data developed under paragraphs (d)(1) and (2) of this section, the lead agency shall conduct a site-specific baseline risk assessment to characterize the current and potential threats to human health and the environment that may be posed by contaminants migrating to ground water or surface water, releasing to air, leaching through soil, remaining in the soil, and bioaccumulating in the food chain." The EPA Guidance further requires that the DTSC monitor the Site to determine whether contaminants have migrated. The EPA Guidance advises that field investigations should use information relating to source location and groundwater flow directions to derive a preliminary estimate of the location of contaminants that may have migrated. "Uses of adjacent properties should be determined in order to evaluate potential exposure associated with offsite migration of subsurface contamination."

STHIP asserts that DTSC has ignored these mandates, that contaminants are up to hundreds of thousands of times above allowed levels, that there is offsite migration at the parcel across Kinneloa; and that nothing suggests that this migration will be stopped as there is no remedial measure.

Here, the trial court concluded that NCP does not require offsite testing and the issue should be framed as whether DTSC's decision not to conduct

45

offsite testing complies with the NCP. We agree. DTSC analyzed exposure pathways and media that could affect human health (soil and air) and concluded exposure would be limited because the Site would be developed with structures and paved roadways. Further, the trial court observed that groundwater was located at depths below 300 to 340 feet, would not be used for any purpose at the Site, and would not have been affected by the previous activities. Further, the RAW required that cleanup of contaminants meet standards for residential use. As such, no hazardous waste will be left in the soil or soil gas.

DTSC's decision not to test for offsite contaminants is supported by substantial evidence. There is no evidence that hazardous substances had migrated off Site, and STHIP has cited nothing in the record to support such a claim.

### 4. *The RI/FS Met the NCP's Requirements for Groundwater Testing*

STHIP asserts that the RI/FS violated the NCP because it did not require groundwater testing before the implementation of the RAW's workplan. (See, e.g., 40 C.F.R. § 300.430, subd. (d)(2)(ii).) STHIP asserts that because the RI/FS did not rule out the possibility that groundwater was an exposure medium, it was a violation to delay such testing. STHIP also asserts that nearby groundwater wells had been taken out of service.

Section 300.430, subdivision (d)(2)(ii) of the NCP requires classification of air, surface, and groundwater. Further, the EPA Guidance provides that "the nature and extent of groundwater contamination should be evaluated." Finally, DTSC's own guidance provides that "groundwater must be

quantitatively evaluated in the screening level risk evaluation [of the Site] unless . . . groundwater from the site has no beneficial uses."

Substantial evidence supports the trial court's conclusion that the RI/FS and RAW proposed monitoring and testing satisfied the NCP. The RI/FS and RAW assessed the groundwater at the Site. Given that at the outset, no groundwater contamination had been detected, immediate action was not necessary. None of the underground water at the Site will be used for any purpose at the Site; further, it is at sufficient depth that its status as an exposure pathway is in doubt. However, recognizing that groundwater contamination was a possibility, monitoring wells will be installed, groundwater will be assessed, and remedial action will be taken if necessary.

D.    *Adequacy of Remediation and Testing*

1.    *The RAW Adequately Investigated and Remediated COCs and VOCs*

STHIP contends that the RAW violated NCP requirements to provide overall protection of human health and environment and to comply with the ARARs. STHIP further contends that the RAW inadequately remediates VOC sources in soil gas. We disagree.

(a) *Remediation Was Adequate*

Section 25322.2 specifies that a "remedial investigation" consists of "those actions deemed necessary by the department to determine the full extent of a hazardous substance release at a site, identify the public health and environment threat posed by the release, collect data on possible remedies, and otherwise evaluate the site for purposes of developing a

47

remedial action plan." STHIP asserts (incorrectly) that the RAW does not address or specify remediation for the new COCs.

The RAW established chemical-specific ARARs that specified screening levels for each contaminant of concern identified in the RI/FS process based on applicable state and federal standards for residential use. These residential use screening levels are the most stringent standards applied under California law. To achieve the ARARs, the RAW sets forth a workplan to remove, and to the extent necessary, remediate all four AOCs at the Site. As outlined in the RAW, the excavation will remove over 1,731 tons of soil from the Site. Following excavation, confirmation samples will be collected to ensure that remaining Site soils meet the applicable screening levels based on the ARARs. If they are not, additional excavation will be performed, down to the maximum depth that the equipment will allow, 30 feet below the surface. Due to the extensive excavation, it is likely that no further remediation may be needed at this point. Following excavation, the RAW requires continued soil gas surveys until no further remediation is needed; in addition, VMS will be installed. Furthermore, the SIWP addresses the new COCs and provides for the proposed sampling for the potential presence of residual explosive compounds, such as RDX and TNT, and PFAS will be conducted from all accessible seepage pits and select storm-drain inlets in the vicinity of buildings 3, 5, 18, and 131. Testing will be conducted for PFAs.

### (b) *Adequate Remedy for VOC in Soil Gas*

STHIP complains that the RAW does not adequately remedy soil gas, pointing to, among other things, the trial court's contradictory statements regarding the adequacy of the RAW's remediation; DTSC's false claims that sources of VOCs will be removed prior to construction; removal of 11

48

suspected hot spots will not remove the VOC threat, and post-construction, the developer may need to do soil-vapor extraction; and hot-spot removal will not remove the worst Site harm (from VOCs) because the 11 suspected hot-spots contain mainly metals, not VOCs.

STHIP's attacks amount to a claim that the evidence is insufficient to support the trial court's conclusion that the RAW's proposed remediation will rid the Site of all VOC contaminants sufficient to protect human health. STHIP 's argument ignores the evidence that supports the trial court's conclusion. The RAW requires excavation of contamination, including VOC sources, to the maximum depth that equipment can reach. Such excavation will eliminate or substantially reduce the levels of VOC contamination in soil gas. In the unlikely event there is any remaining vapor intrusion risk, vapor mitigation systems will be used to eliminate any remaining hazardous exposure to VOCs in soil gas. This comports with DTSC's own guidance that "at some sites removal of all volatile chemicals from the subsurface will not be possible and institutional controls and engineering measures will be necessary to prevent potential exposure to subsurface vapors."

### 2.    *Recent Indoor Air Testing*

STHIP complains that recent indoor air testing shows that previous testing was incomplete and the Site is unsafe for public use, and DTSC's failure to conduct indoor air testing was in violation of DTSC's own guidance, which requires such testing. Without citation to the record, STHIP asserts that Notre Dame scientists conducted a two-week passive indoor air screening at the Site and found unacceptable levels of contamination.

We can find no record reference for this latter assertion, or any evidence in the record to support it. Even so, all the buildings on the Site are

to be demolished, so any indoor air testing conducted prior to demolition would be moot.

### E. *Any Purported Factual Misstatements in the Trial Court's Decision Do Not Require Reversal*

STHIP points to what it alleges are five factual misstatements the trial court made, all of which it asserts were based on DTSC's misrepresentations of facts. STHIP asserts that as a result of these false statements of fact, the foundation of the trial court's ruling cannot support its conclusions. We disagree.

STHIP argues the following statements in the trial court's statement of decision, which it contends are false, constitute insufficient evidence to support the trial court's conclusions: (1) "No hazardous waste levels of contamination [should] be left in the soil or soil gas"; (2) "Sources of VOCs will be removed prior to construction"; (3) "Soil gas samples [will be] collected . . . at locations that were deemed to be most likely impacted with chemicals [and] to possess the highest potential for soil contaminant migration affecting groundwater"; (4) "The sampling at the Site was extensive"; and (5) "The preferred long-term response to the intrusion of vapors into buildings is to eliminate or substantially reduce . . . contamination," and this is "what the RAW strives to accomplish by . . . excavation of the Project Site's [metals] hotspots."

In support of its contentions these statements are false, STHIP relies on conflicting evidence in the record, including comments made during the RAW's review period in which evidence attacked the depth of soil excavation and areas of focus. However, STHIP's approach ignores the appellate standard of review, which requires us to affirm factual findings if supported

by substantial evidence.  As we have stated at length, substantial evidence supports the trial court's conclusions.

## DISPOSITION

The judgment of the superior court is affirmed.  Respondents are to recover their costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


WILLHITE, Acting P. J.

We concur:


COLLINS, J.


CURREY, J.

# INDEX OF ACRONYMS

| Acronym | Full Title |
|---------|-----------|
| AOC | Area of Concern |
| ARAR | Applicable or Relevant and Appropriate Requirements |
| CERCLA | Comprehensive Environmental Response, Compensation and Liability Act (Federal) |
| COC | Contaminant of Concern |
| DTSC | Dept. Toxic Substances Control (California) |
| ESL | Environmental Screening Level |
| HSAA | Hazardous Substances Account Act (California) |
| NDMA | N-nitroso dimethylamine |
| NCP | National Contingency Plan (40 C.F.R. 300, et seq.) |
| PAH | Polynuclear Aromatic Hydrocarbon Compounds |
| PCB | Polychlorinated Biphenyls |
| PCE | Tetrachloroethylene |
| PFA | Per- and Polyfluoroalkyl Substances |
| RAW | Removal Action Workplan |
| RDX | Hexahydro-1,3,5-trinitro-1,3,5-triazine |
| RI/FS | Remedial Investigation/Feasibility Study |
| SCAQMD | South Coast Air Quality Management District (Cal.) |
| SCEA | Sustainable Communities Environmental Assessment |
| SIWP | Supplemental Investigation Workplan |
| SL | Screening Level |
| STHIP | Stop Toxic Housing in Pasadena |
| SVOC | Semi-Volatile Organic Compound |
| TNT | 2,4,6- Trinitrotoluene |
| TPH | Total Petroleum Hydrocarbon |
| VOC | Volatile Organic Compound |